[Civ. No. 7913. Fourth Dist., Div. One. Oct. 10, 1966.]

SUZANNE SPACKMAN, a Minor, etc., et al., Plaintiffs and Respondents, v. LORENS H. GOOD, Defendant and Appellant.

Whelan & Miller and Thomas Whelan for Defendant and Appellant.

Belli, Ashe & Gerry, Melvin M. Belli, Hervey & Mitchell and Thomas R. Mitchell for Plaintiffs and Respondents.

COUGHLIN, J.—Defendant appeals from an order denying his motion for judgment notwithstanding the verdict, and from the judgment awarding damages upon a complaint alleging willful injury from misconduct causing emotional and mental distress and disturbance.

The plaintiffs, Suzanne and Paul, were born, respectively, on July 28, 1946, and Sept. 20, 1948; when defendant's alleged misconduct occurred were 15 and 13 years of age; at the time of trial were 17 and 15; and now are 20 and almost 18.

One of the unusual facets of the case is the fact that these minors, who are the real parties in interest,[1]

---

[1] In an action by a general guardian on behalf of a minor, the latter only, and not the former, is a party to the suit. (*Karr* v. *Parks*, 44 Cal.

testified that they did not believe the defendant had injured them physically or emotionally, and did not wish to proceed with the action which had been instituted by the guardian of their estates contrary to their wishes.

For years plaintiffs were subjected to an unhappy home environment. Suzanne testified that as long as she could remember her father and mother were "always quarreling." This was a day-to-day occurrence which constantly disturbed her; and often was accompanied by physical violence of one toward the other. Paul testified that his father used to "beat up" his mother "quite a bit"; and while she was living with him she tried to commit suicide "about seven times." One of these suicide attempts was followed by placement in a sanitarium. This state of affairs existed before the Spackmans met the Goods in the latter part of 1960. On Christmas of that year the Spackman and Good families were together at the latter's home; champagne was served; and Suzanne was served "two glasses," first by her father and then by the defendant. This was the first time she had had champagne. Previously she had been served wine "now and then" at her home, by both her father and her mother.

On June 1, 1961, Mr. Spackman separated from Mrs. Spackman and left the family home in Del Mar at 2102 Coast Boulevard. This was followed by an action for divorce filed by Mrs. Spackman on July 13, 1961.

When the father left, the plaintiffs remained with their mother. On August 17, 1961, the court, in the divorce action, made its order awarding custody of plaintiffs to Mrs. Spackman pendente lite; and on May 21, 1962, entered an interlocutory decree of divorce decreeing both Mr. and Mrs. Spackman were entitled to a divorce and awarding custody of the plaintiffs to Mr. Spackman. The events upon which the charges of misconduct alleged in the instant complaint are predicated occurred during the time the plaintiffs were in the custody of Mrs. Spackman.

After filing the divorce action, and about the first of August, 1961, Mrs. Spackman and plaintiffs had moved to an Ocean Front Street residence owned by the Goods where they lived for about five months; thereafter moved to another house owned by the Goods across the street from the latters' residence, where they stayed until February or March 1962; and

46, 48; *Emeric* v. *Alvarado,* 64 Cal. 529, 593 [2 P. 418]; *O'Shea* v. *Wilkinson,* 95 Cal. 454, 456 [30 P. 588]; *Loock* v. *Pioneer Title Ins. Co.,* 4 Cal.App.2d 245, 248 [40 P.2d 526].)

then moved into the Good residence, where Suzanne occupied a bedroom previously occupied by ''Sissy'' Good, defendant's 19-year-old daughter. The members of the Good family living in this residence at this time consisted of the defendant, his wife, his daughter ''Sissy,'' and another daughter, 21 years of age. The stay in the Good residence was a temporary one, pending improvement of an adjoining cottage into which Mrs. Spackman and the plaintiffs moved about the 1st of April.

The evidence in the case on the issue of liability, in overall context, was directed to proof that the defendant was an evil, immoral, depraved, sinful person; established specific acts of misconduct involving plaintiffs; but in larger measure concerned transgressions involving the plaintiffs' mother, the defendant's wife, and minors other than plaintiffs.

■■■ Applying the controlling test on appeal (see *Thomas* v. *Hunt Mfg. Corp.*, 42 Cal.2d 734, 736 [269 P.2d 12]; *Johnson* v. *Griffith*, 19 Cal.2d 176, 179 [120 P.2d 6]), the evidence on the issue of defendant's misconduct involving Suzanne supports the conclusions defendant furnished intoxicating liquor which he permitted Suzanne and her friends to consume; participated in administering and compiling the results of a written sex questionnaire known as the ''New Decency Test''; kept in his study drinking glasses upon which were pictures of nude women which Suzanne saw on one occasion; in the presence of Suzanne on ''more than two'' occasions advocated the philosophy that no sexual act was wrong if the participant did not believe it was wrong; owned a book entitled ''A Radical Approach to Child Rearing'' by A. S. Neill, commonly given the title ''Summerhill,'' which he loaned to Suzanne at her request following a suggestion by two of her teachers that she read it; participated in a controversial discussion with a witness named Moehling, in the presence of Suzanne, concerning the subject of rape; suggested that Moehling demonstrate his contention, using Suzanne as the victim, which Moehling refused to do; permitted Suzanne to sleep on a couch with a boy named Beere, both of them being fully clothed; permitted Beere, while under the influence of alcohol, to spend the night in the same bedroom with Suzanne; and transported Suzanne, at her request, to a State camp ground known as La Costa Downs where she and a number of boys engaged in a drinking party and unchaste conduct. Premised upon the conclusion the foregoing misconduct was tortious and resulted in emotional and mental distress and disturbance, the jury awarded Suzanne compensa-

tory damages in the sum of $25,000 and exemplary damages in the sum of $35,000, or a total of $60,000.

The foregoing summarization is based upon evidence legally admissible on the issue of defendant's misconduct as distinguished from hearsay testimony admitted for other purposes, and is limited to a consideration of the misconduct involving Suzanne.

As to the matter of furnishing intoxicating liquor, there is testimony defendant on "more than a few" occasions furnished beer, champagne, and bourbon which he permitted Suzanne and others to drink; and that he entered a plea of guilty to the criminal charge of contributing to the delinquency of a minor by furnishing such.

Respecting the sex quiz, there is evidence indicating the existence of two questionnaires, one of which had been brought from school by Suzanne and her associates while the other, although its source was not identified, had been used at defendant's residence; that the questions propounded thereby elicited information concerning the homosexual and heterosexual activity of the persons answering, whose replies consisted of numbers, and their experience in the premises was determined by adding the total of the numbers given as answers; that Suzanne answered the questionnaire either at school or at defendant's home; and that defendant's participation in the test was to total the numbers given in the answers, although there is no evidence he did such with respect to any questionnaire answered by Suzanne.

The evidence respecting the photographs of nude women on drinking glasses was that defendant had such on display in his den or study; Moehling testified he and Suzanne looked at them on one occasion; and Suzanne testified she had seen them once by accident, did not think they were "right", and did not "approve" of having nudes portrayed on drinking glasses.

There is testimony the defendant gave lectures in which he discussed the philosophy of sexual behavior advocated in the book "Summerhill"; defined terms identifying abnormal sex acts which are referred to in that book; and purportedly advocated acceptance of this philosophy. In his lectures on the philosophy that right and wrong in sex matters is relative, depending upon the attitude of the participant, defendant asserted that if anyone believes his sexual behavior is right, he is not accountable therefor to another, even to God. It is contended, in support of the judgment, defendant's advocacy of this philosophy caused Suzanne to change her attitude toward

her religion. When interrogated about this, Suzanne testified there had been a change in her attitude which she attributed to reading several books respecting other religions, in preparation for a term paper at school, and it was not "due to talking to Mr. Good."

The incident involving Suzanne sleeping on a couch with Beere occurred in the early part of February 1962, in the front room of the Good residence, and came to the attention of defendant when he placed a blanket over the two young people, who slept there for the night. Suzanne testified Beere did not molest her while they were on the couch together, and when she awoke in the morning he had gone. The second incident involving Beere occurred on March 16, 1962, at which time Suzanne was occupying the bedroom formerly occupied by "Sissy" Good. Beere testified that on the night in question he and Suzanne had been drinking liquor furnished by the defendant; close to midnight, when they were in the bedroom, where there were two beds at right angles, defendant placed the two beds together, pulled back the sheets and said it would be all right for them to stay there for the night; following this both of them spent the night in bed without clothes on. Suzanne testified Beere was intoxicated; she and "Sissy" brought him from the living room into the bedroom and laid him on one of the beds, whereupon he passed out; and, sometime thereafter she occupied and went to sleep in the other bed. In support of the judgment it is insinuated that Suzanne and Beere had sexual intercourse; she testified to the contrary; and her testimony was uncontradicted. There was testimony defendant had told Suzanne what she should do in the event Beere gave her any trouble, describing a sexual act in uncouth language. Suzanne testified defendant did not make such a statement. Beere was not interrogated about the matter.

On March 17, 1963, according to testimony by Moehling, after he and Suzanne returned from a concert, the defendant made a bed for Moehling in the living room of the cottage where Suzanne was staying in order that he might remain there overnight; after he retired Suzanne came into the room, took off her robe, sat on the end of the bed and told him she and Beere were in bed together the night before and she felt guilty about this even though the defendant "over and over" had told her she ought not to feel guilty; and following this conversation Suzanne started to get into bed with him, but he stopped her.

The La Costa Downs incident concerned a drinking party occurring on April 18 and 19, 1962, at a camp ground maintained by and under the supervision of the State of California. Suzanne knew the boys were going to be at the camp ground at this time and asked defendant to take her there in his automobile, which he did. There is testimony that after the defendant left Suzanne and the boys became intoxicated; she exhibited her breasts to one of the boys; she and another boy spent the night in a sleeping bag in the nude; and in the morning she went into a trailer and got into bed with a third boy. One of the boys at the party testified that in his opinion Suzanne and the boy with her in the sleeping bag engaged in an act of sexual intercourse. Suzanne, in her testimony, admitted she was intoxicated, but denied she spent any time in a sleeping bag with a boy, or was in bed in the trailer with another boy. On the second day one of the boys brought Suzanne home and she obtained permission from her mother to return to the camp that night. There is testimony that on this occasion she and the boys participated in a game known as ''Hungarian Refugee'' in which she was the refugee, clothed only in a blanket, and the boys were Communists whose objective was to disrobe the refugee and subject her to their sexual desires. Suzanne, in her testimony, admitted participation in the game but denied she was clothed only in a blanket and asserted she did not have sexual intercourse nor participate in any sexual act on this or any other occasion at the camp.

There is evidence defendant's participation in the La Costa Downs incident included not only transporting Suzanne to the camp but also furnishing some of the liquor used there, the balance being furnished by the boys in attendance; permitting one of the boys to use his Thunderbird while at the camp after returning him home; and purchasing a tent for use by the group on the second night.

On the issue of misconduct involving Paul, the evidence supports the conclusion he also drank liquor furnished to the group by defendant while the latter was present; answered the sex questionnaire, apparently with participation by defendant, although Paul testified he took the ''sex quiz'' at school and not at defendant's residence; saw the drinking glasses with the pictures of nudes imprinted thereon, when accompanied by Moehling, one of which showed his mother; saw other pictures of nudes, one of them being pornographic, which were hidden in a storeroom, when he and Moehling undertook a search for them; was present when the defendant

expressed his philosophy that right and wrong in sex matters were relative, which occurred on "more than two occasions," although Paul testified he was not present at any sex lectures given by defendant; and had the opportunity of reading the book "Summerhill," but there is no evidence Paul read any part of the book, and he testified no part of it was read to him nor did he hear any part of it read to others. Premised upon the conclusion the foregoing misconduct by defendant was tortious and was the cause of emotional and mental distress and disturbance, the jury awarded Paul compensatory damages in the sum of $15,000 and exemplary damages in the sum of $25,000, or a total of $40,000.

The evidence in support of the allegations that defendant's misconduct toward plaintiffs caused them emotional and mental distress and disturbance, in large measure, consisted of the testimony and opinions of two experts, one a psychiatrist and the other a psychologist. The psychiatrist examined plaintiffs and saw each of them a total of six times commencing July 3, 1963, which was after they had been placed with their father. The psychologist administered tests which formed the basis for his opinion on January 2, 1964. The trial of the instant action commenced on the latter date. In substance, these experts concluded plaintiffs had sustained sex trauma sometime within a period they estimated to be between six months and two years prior to trial, which caused plaintiffs to be emotionally disturbed.

The psychiatrist testified Suzanne's condition was pre-schizophrenic and pre-paranoiac; it "would be very hard to say" whether these schizophrenic, paranoiac elements were present prior to the time Suzanne went to the Good residence; if these elements were present, the environment in the Good residence aggravated them; Paul "showed a very similar pathology in many ways"; there is "no question that the family turmoil and the bitterness and anger that existed between the parents . . . has contributed a great deal to the youngster's feeling, but quite a bit of this is undoubtedly the result of a situation in which at this time of turmoil they were placed in a household where their religious beliefs and ethical belief, and sexual needs and their needs for secure, and true, warm, emotional love were ignored or distorted or overly stimulated"; "certain aspects" of plaintiffs' "emotional disorder could be attributed in goodly degree to the condition that Mrs. Spackman was in, her emotional state and her influence and also the quarreling and difficulties between herself

and her husband''; defined schizophrenia as that condition evidenced by symptoms of loss of contact with reality, bizarreness and difficulty in personal relations; and defined paranoia as a condition evidenced by symptoms present when a person is suffering from delusions of persecution or grandeur or projecting the blame for his difficulties onto some other person.

The psychologist, basing his conclusions upon the results of tests administered by him, agreed in the main with the opinions given by the psychiatrist. One exception was his conclusion that the sex trauma demonstrated could be attributed to an unhappy home life or divorce in the family. As to Suzanne the report of the psychologist summarized his findings as profound disturbance in the psychosexual sphere of development which appears to be related to some recent traumatic experience; and sets forth his ''impression'' as: Psychoneurotic disorder, obsessive-compulsive reactions with incipient paranoid schizophrenia associated with sex trauma. The psychological report on Paul summarized the findings as: ''A 15-year old lad who is disturbed in the area of psychosexual development. He is not psychotic'' and ''his emotional disturbance is not related to any recent traumatic experience . . .''; and under the heading ''IMPRESSION:'' stated: ''Personality trait disturbance, Passive-Aggressive Personality, Passive Dependent type with schizoid mentation and possible sex deviation.''

Expert testimony offered by defendant contradicted that offered by plaintiffs.

Obviously pertinent events material to the cause of plaintiffs' emotional and mental state at the time of their examination by the psychiatrist and psychologist took place following the incidents occurring at defendant's residence during the spring of 1962. On May 10th of that year the hearing of the Spackman divorce action commenced and culminated in a decree under date of May 21, 1962, awarding custody of plaintiffs to their father. Plaintiffs were involved in this hearing. In June of 1962 a six-count criminal complaint was filed against defendant charging him with contributing to the delinquency of nine teenage minors by furnishing liquor to and encouraging sexual activity between them. Suzanne was one of the minors named in one of the counts; the others were a part of the group who used defendant's residence as a meeting place; Paul was not included. Defendant entered a plea of guilty as to three counts, including that naming Suzanne. The remain-

ing three counts were dismissed. Thereupon proceedings were undertaken to declare defendant a sexual psychopath. Two hearings were conducted. Plaintiffs were called as witnesses and testified. The subject of their testimony, insofar as disclosed by the record, concerned the incidents which are the basis of the claim of tortious conduct in the instant proceedings. Defendant was committed to Atascadero State Hospital for observation as a sexual psychopath. After a stay at that hospital he was returned to the municipal court with a finding by the superintendent that he was not a sexual psychopath. Thereupon he was fined $3,000; sentenced to imprisonment in the county jail for 270 days, execution of which was suspended; and was placed on probation for five years, one of the conditions of which was imprisonment for 90 days. Suzanne was upbraided by her father because she testified in favor of defendant at the sexual psychopathy hearing. He called her a slut and a whore. On April 3, 1963, plaintiffs' father, as their guardian, commenced the instant action which plaintiffs opposed. The following month each of the plaintiffs was made a ward of the juvenile court because they were truant from school; in June were placed with their father; and in the following January, during the course of the instant trial, were placed in a foster home.

As grounds for reversal, defendant contends the verdicts were excessive; the court erred in refusing to give requested instructions; counsel for plaintiffs were guilty of misconduct; error in admission of certain testimony; and insufficiency of the evidence.

There is strong basis for the belief the verdicts were the product of passion and prejudice resulting in part from misconduct by counsel for plaintiffs and the reception of inadmissible evidence, but extended consideration thereof is unnecessary in view of our conclusion the judgment should be reversed because the evidence does not establish the causes of action upon which it is based.

The cause of action of each plaintiff is predicated upon a wilful infliction of emotional and mental distress and disturbance with consequent compensable psychopathic injury.[2]

It is settled in California that the intentional infliction of severe mental or emotional distress or disturbance caused by

[2]The complaint was premised upon the theory that defendant had wilfully caused emotional and mental disturbance and distress to plaintiffs; the jury instructions were limited to the presentation of this theory; and as a consequence, the verdict represents only a determination of issues of fact material to this theory.

wilful and outrageous conduct, in the absence of privilege, constitutes an actionable tort for which the victim may recover damages. (*State Rubbish etc. Assn.* v. *Siliznoff*, 38 Cal.2d 330, 336-339 [240 P.2d 282]; *Perati* v. *Atkinson*, 213 Cal.App.2d 472, 474 [28 Cal.Rptr. 898]; *Guillory* v. *Godfrey*, 134 Cal.App. 2d 628, 633 [286 P.2d 474]; *Richardson* v. *Pridmore*, 97 Cal. App.2d 124, 130 [217 P.2d 113]; cf. *Bowden* v. *Spiegel, Inc.*, 96 Cal.App.2d 793, 795 [216 P.2d 571]; *Emden* v. *Vitz*, 88 Cal.App.2d 313, 318 [198 P.2d 696]; Rest. of Law, Torts (1948 Supp.) § 46; Rest.2d Torts, § 46; Prosser, Law of Torts (3d ed. 1964), p. 48.)[3] The rationale supporting this rule, absent evidentiary problems incident to a particular situation, directs inclusion within its scope of "psychological" or psychopathic injuries. (*Alsteen* v. *Gehl*, 21 Wis.2d 349 [124 N.W.2d 312, 316].)

Particularly pertinent to the case at bench is the issue of intent. Liability under the rule attaches only if the actor intended or should have recognized his conduct is likely to cause the resultant harm. (*Bowden* v. *Spiegel, Inc., supra*, 96 Cal.App.2d 793, 795; *Savage* v. *Boies*, 77 Ariz. 355 [272 P.2d 349, 351]; *Fraser* v. *Morrison*, 39 Hawaii 370; *National Life & Accident Ins. Co.* v. *Anderson*, 187 Okla. 180 [102 P.2d 141, 142]; *Samms* v. *Eccles*, 11 Utah 2d 289 [358 P.2d 344, 347]; *Alsteen* v. *Gehl, supra*, 21 Wis.2d 349 [124 N.W.2d 312, 318]; Rest. of Law, Torts, (1948 Supp.) § 46; Rest. of Law, Torts, §§ 312, 313; see also Prosser, Law of Torts, (3d ed., 1964) p. 52; Prosser, *Insult and Outrage* (1956) 44 Cal.L.Rev. 40, 55;

---

[3] The rule has been applied in other jurisdictions to authorize recovery in a variety of factual situations. (See *Clark* v. *Associated Retail Credit Men*, 105 F. 2d 62, 64; *Stephens* v. *Waits*, 53 Ga. App. 44 [184 S.E. 781]; *Fraser* v. *Morrison*, 39 Hawaii 370; *Knierim* v. *Izzo*, 22 Ill. 2d 73 [174 N.E.2d 157]; *Barnett* v. *Collection Service Co.*, 214 Iowa 1303 [242 N.W. 25, 26-27]; *Johnson* v. *Sampson*, 167 Minn. 203 [208 N.W. 814]; *Halio* v. *Lurie*, 15 App. Div. 62 [222 N.Y.S. 2d 759, 762]; *Mitran* v. *Williamson*, 21 Misc.2d 106 [197 N.Y.S. 2d 689]; *Samms* v. *Eccles*, 11 Utah 2d 289 [358 P.2d 344]; *Alsteen* v. *Gehl*, 21 Wis.2d 349 [124 N.W.2d 316, 317]; generally see Prosser, Law of Torts (3d ed.) pp. 41-52.) The right to recover damages for the wilful infliction of mental or emotional distress or disturbance has been the subject of many law review articles. (Magruder, *Mental and Emotional Disturbance in the Law of Torts* (1936), 49 Harv. L. Rev. 1033, 1058; Smith and Solomon, *Traumatic Neuroses in Court* (1943), 30 Va. L. Rev. 87; Wade, *Tort Liability for Abusive and Insulting Language* (1950), 4 Vand. L. Rev. 63, 82; Proehl, *Anguish of Mind* (1961), 56 N.W. Univ. L. Rev. 477, 491; *The Right to Mental Security* (1963), 16 Fla. L. Rev. 540, 546; McNiece, *Psychic Injury and Tort Liability in New York* (1949), 24 St. John's L. Rev. 1, 61; see also 64 A.L.R. 2d 110, 115, 119; 25 N.A.C.C.A. 116, 122.)

530

64 A.L.R.2d 110, 119-120; 25 N.A.C.C.A. 122.) ■ Where the offensive conduct was not undertaken for the purpose of causing the harm received proof of the intent of the actor to cause such harm, in substance, may be supplied by proof of circumstances showing the conduct was of that nature which reasonably should have been recognized as likely to cause the harm sustained.[4] On the other hand, the rule as presently expressed in Restatement of the Law of Torts imposes liability upon a wrongdoer who by extreme and outrageous conduct intentionally *or recklessly* causes severe emotional distress to another. (Rest.2d, Torts, § 46, and com. sub. par. (i).)

■ In the case at bench the injury for which plaintiffs seek recovery is mental and emotional distress and disturbance, principally of a psychopathic nature, allegedly caused by defendant's wrongful conduct. There is no evidence supporting the conclusion defendant engaged in such conduct for the purpose of inflicting such injury. Neither is there evidence supporting a conclusion defendant realized or should have realized his conduct likely would cause such injury. Plaintiffs' case differs from others in which recovery has been allowed for mental and emotional distress or disturbance resulting from threats, conduct causing fright or shock, the utterance of insulting and abusive words, or the making of false accusations. Wrongful conduct of the nature involved in the latter cases, even where not intended, should be recognized by the wrongdoer as likely to cause emotional and mental distress or disturbance. The proven misconduct of defendant, basic to recovery in the instant case, is not within this classification. ■ Although there is testimony supporting the

[4]The court and text writers in various ways have described the circumstances supplying the element of intent where the purpose of the actor was not to cause the harm received. (*Savage* v. *Boies, supra,* 77 Ariz. 355 [272 P.2d 349, 351]—acting with knowledge that emotional disturbance is substantially certain to be produced by the conduct; *National Life & Accident Ins. Co.* v. *Anderson, supra,* 187 Okla. 180 [102 P.2d 141, 142]—proof that defendant acted with intent to injure plaintiff or knew plaintiff was in such condition that it would be probable the former's conduct would result in serious injury and acted in wilful disregard of the possibility of serious injury; *Samms* v. *Eccles, supra,* 11 Utah 2d 289 [358 P.2d 344, 347]—engaging in conduct with the purpose of inflicting emotional distress or ''where any reasonable person would have known that such would result''; Prosser, Law of Torts, p. 52—proof of a high degree of probability that mental distress and disturbance will follow and the defendant went ahead in conscious disregard of it; Rest. of Law, Torts, § 312—liability attaches where the actor subjects another to emotional distress which he should recognize as likely to result in illness of which the distress is a legal cause; 64 A.L.R.2d 119-120—conduct in reckless disregard of consequences.

conclusion plaintiffs were shocked when they saw a picture of their mother in the nude on one of the drinking glasses in defendant's study, the circumstances attendant upon this incident did not establish liability under the general rule. Defendant's misconduct consisted of permitting the drinking glass in question to be in a place where it might be seen by plaintiffs. He did not show the glass to them, encourage them to look at it, nor advise them of its being in the study. Their presence in defendant's residence, with implied permission to go into the study, resulted from the act of the mother, who was their legal custodian, in taking up residence in his household. Defendant's conduct in displaying photographs of nudes, including one of plaintiffs' mother, on glasses in his study, offends common decency and is reprehensible. Nevertheless, the evidence does not justify the conclusion he acted in the premises with the purpose of harming plaintiffs, nor that he should have recognized the likelihood that his action would cause such harm. Furthermore, the shock upon seeing the glass in question upon one occasion could not have produced that "severe" mental or emotional distress or disturbance to which liability is limited under the general rule.

It is alleged that as a result of defendant's misconduct, plaintiffs sustained injury to their reputations; that they became known as sex deviates. Legally admissible evidence upon this issue does not establish that either of the plaintiffs were sex deviates or engaged in any sexual activity on account of which they had the bad reputation their father and guardian attempted to prove. In this, as in many other instances in this case, reliance is placed upon hearsay testimony to establish the truth of the contents of conversations admitted under a ruling excluding their use for this purpose. No causal relationship is shown between defendant's misconduct and plaintiffs' alleged bad reputations. Furthermore, it is not shown that plaintiffs knew their reputations were bad. Lacking such knowledge, their reputations could not have caused them mental or emotional distress and disturbance.

Coincident with the problem whether the evidence is sufficient to support the conclusion defendant should have recognized the likelihood his conduct would inflict upon plaintiffs mental or emotional distress or disturbance in the nature of a psychopathic condition is the problem whether the evidence is sufficient to support the conclusion his conduct caused this condition. In the past many courts have expressed reluctance to impose liability for mental or emotional distress or disturb-

ance not associated with physical injury because of administrative difficulties and practical considerations attendant upon a just determination in the premises. (See *Amaya* v. *Home Ice, Fuel & Supply Co.,* 59 Cal.2d 295, 299-313 [29 Cal.Rptr. 33, 379 P.2d 513] ; *State Rubbish etc. Assn.* v. *Siliznoff, supra,* 38 Cal.2d 330, 336-339 ; see also the cases, law review articles and texts cited in footnote 3 hereof.) One of the attendant factors is the restricted availability of adequate proof to establish the element of causation, i.e., that the wrongdoing caused the injury, with that degree of certainty required by law. In this regard the court in *State Rubbish etc. Assn.* v. *Siliznoff, supra,* 38 Cal.2d 330, 338, wherein it adopted the general rule under consideration, noted that jurors from their own experience "are aware of the extent and character of the disagreeable emotions that may result from the defendant's conduct," presumably referring to conduct of the nature under consideration in that case, i.e., threats of violence. On the other hand, in considering a related situation where the issue of causation is dependent upon conflicting expert testimony, that court said: "[T]he 'resolution' of such conflicts often borders on fancy when the causation of alleged psychoneural disorders is at issue." (*Amaya* v. *Home Ice, Fuel & Supply Co., supra,* 59 Cal.2d 295, 312 ; generally see Smith and Solomon, *Traumatic Neuroses in Court* (1943) 30 Va.L.Rev. 81, 88-92.) In the *Amaya* case, wherein plaintiff sought damages for mental and emotional distress and disturbance caused by defendant's negligence, the court concluded that imposition of a duty upon an alleged wrongdoer to so conduct himself with respect to another as not to subject a third person to shock or fright was foreclosed by administrative and other practical considerations attendant upon recovery of damages for the breach of such a duty. Although this decision relates only to the existence of a duty basic to liability for negligence rather than for intentionally inflicted injury, the observations in the opinion respecting the adequacy of expert testimony "when the causation of alleged psychoneural disorders is at issue" applies to both situations. We do not hold that the duty to refrain from intentionally causing another severe mental or emotional distress or disturbance, and the correlative right to be free from such, does not extend to mental or emotional distress or disturbance of a psychopathic nature because problems of proof inherent in the issue of causation incident to recovery on account of the latter type of injury preclude a determination consonant with justice. Nevertheless, the complexity of the issue of causation in actions seeking recovery for mental or

emotional distress or disturbance should be recognized. (See Smith and Solomon, *Traumatic Neuroses in Court* (1943), 30 Va.L.Rev. 87, 102-110.) Particular inquiry should be directed to the sufficiency of proof of the cause of a psychopathic condition where, as in the case at bench, the only evidence upon the issue is the conflicting opinions of experts. (See *Alsteen* v. *Gehl, supra,* 21 Wis.2d 349 [124 N.W.2d 312, 317]; Smith and Solomon, *Traumatic Neuroses in Court,* 30 Va. L.Rev. 87, 123-129; 64 A.L.R.2d 113.) The problem is one of substantial evidence. (Generally see *Halio* v. *Lurie, supra,* 15 App.Div. 62 [222 N.Y.S.2d 759, 763]; *Alsteen* v. *Gehl, supra,* 21 Wis.2d 349 [124 N.W.2d 312, 318]; Prosser, Law of Torts (2d ed.) 212, 213; Prosser, Law of Torts (3d ed.) p. 42, fn. 31, p. 43, fn. 38; McNiece, *Psychic Injury and Tort Liability in New York* (1949), 24 St. John's L.Rev. 1, 2, 68, 73-74; Smith, *Relation of Emotions to Injury and Distress: Legal Liability for Psychic Stimuli* (1944), 30 Va. L.Rev. 193, 303.) The issue must be decided upon a case-to-case basis. The question concerns the adequacy of proof in a specific case rather than the adequacy of proof generally with respect to a particular class of injury. In determining whether an expert opinion is legally sufficient proof of the cause of a psychopathic condition, under circumstances such as in the case at bench, the court unhesitatingly must subject the evidence to a scrutinizing analysis to ascertain the presence or absence of supportive factors. An opinion not supported by reason or contrary to reason in light of such an analysis, should be rejected as a matter of law.

 In the case at bench there is substantial evidence supporting the conclusion that at the time plaintiffs were examined by their psychiatrist and psychologist they were psychopaths. However, the conclusion that their psychopathy was caused by the proven misconduct of defendant is not supported by substantial evidence. The expert opinions that within the period of two years prior to examination they had sustained "sex trauma" which caused their psychopathic condition does not establish defendant's misconduct as its cause. The phrase "sex trauma" used by the experts to identify the disturbing experiences to which they attributed plaintiffs' psychopathy, and the term "scars" used to identify the residual effects, are not self-explanatory. The components of the conditions thus described do not appear from the evidence. No organic injury was present. The psychiatrist referred to the "environment" in which plaintiffs had been

living as a cause, but did not relate it to specifics attributable to defendant's misconduct. Probable causative factors attendant upon plaintiffs' psychopathy indicated by evidence, in addition to an "environment" created by defendant's misconduct, were their subjection to a home life dominated by quarreling, fighting and bitterness between their parents over a period of years; the intense domestic disputes between their mother and father climaxing in the divorce and custody proceedings in which they were emotional participants; the criminal proceedings against defendant with attendant publicity which involved them as victims and witnesses; the change in their custody and resultant disputes with their father; and the maintenance of the instant action which sought to prove they had become sex delinquents, had engaged in promiscuous and repulsive sex acts and had a reputation as being sex deviates. The "sex trauma" to which the experts referred is estimated to have occurred within the two-year period prior to trial of this action. The psychiatrist testified plaintiffs' prior distressing home life resulted in a susceptibility to their present condition which was "triggered" by the "sex trauma" that occurred during the two-year period. The psychologist testified that the prior distressing home life may have caused the "sex trauma." The effect of distressing factors other than defendant's misconduct, particularly those occurring during the two-year period, as a cause of the "sex trauma" is not disclosed. Hypothetical questions used to develop the experts' opinions on the issue of causation included unproven acts of misconduct by defendant and failed to include other pertinent causative factors. We conclude the expert opinions on the issue of causation lack that degree of probative force essential to legal proof. (Cf. *People* v. *Bruce,* 64 Cal.2d 55, 62-65 [48 Cal.Rptr. 719, 409 P.2d 943] ; and generally see *Fewel & Dawes, Inc.* v. *Pratt,* 17 Cal.2d 85, 89 [109 P.2d 650] ; *Forslund* v. *Forslund,* 225 Cal.App.2d 476, 499 [37 Cal.Rptr. 489] ; *Estate of Bishop,* 209 Cal.App.2d 48, 53-54 [25 Cal.Rptr. 763].)

The evidence is not sufficient to establish defendant's misconduct was the cause of plaintiffs' mental state, that defendant acted with intent to cause this condition, or that his action was of such a nature he should have anticipated it was likely to cause that condition. In light of these conclusions, the order denying defendant's motion for judgment notwithstanding the verdict was error.

The order and judgment appealed from are reversed with

instructions to the trial court to enter judgment in favor of defendant.

Brown, P. J., concurred.

Whelan, J., deeming himself disqualified, did not participate.

A petition for a rehearing was denied October 26, 1966, and respondents' petition for a hearing by the Supreme Court was denied December 7, 1966.