Swan, J.
The greenhouse was unsightly, to begin with. There is no doubt whatever about that. But what then ensued was sheer rancor over everything else, resulting in a three-day trial in the Lowell District Court in which a jury returned a verdict and awarded damages in favor of Kimberly Smith (“Smith”) and Kevin Riley (“Riley”) against Eric Wright (‘Wright”) and Komeeka Farm & Equestrian Center (“Komeeka Farm”) for trespass, intentional infliction of emotional distress, and nuisance. On this appeal, Wright and Komeeka Farm contend that Smith and Riley failed to present a legally sufficient case, and that the trial judge erroneously precluded a defense witness from testifying, denied their request to reread certain instructions to the jury, denied their various motions for judgment and other relief, and declined to dismiss Komeeka Farm as a party having no independent legal identity.
The jury could have found the following. In May, 2006, Smith purchased a house in Tyngsboro for herself and her fiancé, Riley.[2] Shortly after moving in, she installed an above-ground swimming pool. Wright owned a home abutting the rear of Smith’s property. Wright’s property consisted of a pork-chop shaped lot, with a driveway parallel to Smith’s driveway and separated from it by a grassy strip; on his lot was a house, a shed, a barn and paddocks, from which he ran Komeeka Farm for the boarding of horses and riding lessons. Komeeka Farm was already an operating enterprise when Wright acquired his property.
Located on Smith’s back lot was a greenhouse, which had been used by the prior owner for growing orchids. The greenhouse was eighty by twenty-seven feet in size; was made of wood, steel piping, and a plastic cover; was furnished with heating, an oil tank, electricity and an alarm system; and had an industrial appearance. The greenhouse was visible from Wright’s property. Both Smith and Wright agreed that *25 the greenhouse was an eyesore. Both agreed that it should be removed from Smith’s lot. As will be seen, they disagreed only as to how.
Smith wanted to sell the greenhouse, and conferred with a number of potential buyers or renters, but without success. After an initial neighborly introduction, Wright offered several times to remove the greenhouse himself. He said he could plow it down with his tractor and dump the materials on a slope on his property. Each time Smith or Riley declined the offer, telling him that they were trying to sell the greenhouse, and that they had just moved in and had other more pressing concerns, including their full-time jobs. On September 12, 2006, while Smith and Riley were at work, Wright sent Richard Linnell (“Linnell”) and two helpers to Smith’s property, where they partially dismantled the greenhouse, and moved parts of it off-site. Smith had given neither Wright nor Linnell permission to enter her property or remove the greenhouse. When Smith and Riley came home, all that was left of the greenhouse were hanging plumbing, cut "wires, and a mangled mess. When asked why he had done it, Wright said, “I thought you were throwing it out.” Smith asked Wright, ‘Well, since your friend started taking the greenhouse down, what will he give us for the rest of it?” Wright answered, “Nothing.” After a lull in the conversation, Wright said, “Oh, I can’t do anything right,” walked ten feet away, sat down on Smith’s lawn and started to cry. That was their last conversation — and the end of neighborly relations.
Riley tried to remedy the situation temporarily by covering the remains of the greenhouse and the exposed heating, oil tank, fans, and other equipment with a tarpaulin, but a storm blew away the tarpaulin. Smith received estimates of $7,000.00 to remove the greenhouse remains and $3,000.00 to landscape the damaged area, and $30,000.00 to rebuild the greenhouse.
Things turned ugly with Wright. One Sunday, shortly after the greenhouse incident, Smith and Riley were pulling out of their driveway and saw Wright in his truck coming the other way. They waved; he grimaced. Wright “floored” the truck and crossed the center line toward Smith and Riley, hitting the brakes at the last minute and turning into his driveway, leaving Smith and Riley shaken, scared, and reluctant to return home. The following February, Wright gathered snow in his tractor from across the street and dumped it in Smith’s driveway. The next spring, Wright began spreading dirt and manure with his tractor, starting at 5:30 AM., with headlights on, and at night until 11:00 P.M. He would often wait to start this work until after Riley arrived home from work, and on weekends when he saw Smith’s and Riley’s cars and knew they were home. Wright was simply thinning out dirt and manure — in Riley’s words, “killing time” and engaging in “excessive tractor usage.” It shook their house and was very loud. To Smith, it was like “a constant earthquake”; she became anxious and lost sleep.
In May, 2007, a survey revealed that Wright’s post and rail fence encroached on Smith’s property. Wright removed the fence, leaving six-to-twelve inch deep holes, which he eventually filled.
One day, Smith was in her pool when Wright and “a group of guys” came to the nearby fence to clear the area and began “cursing and heckling and also spitting in her direction. “Scared to death,” she went into the house and called Riley, who told her to lock the doors. On another day, Smith was cleaning the pool when one of Wright’s workers made a loud “man spit” noise — “hockin’ loogies” in Riley’s phrase *26 — to get her attention and stared at her while she worked. Smith felt intimidated and called Riley, who came home, by which time the man had gone. It made Riley “feel a failure.... I was defenseless.” On June 18, at 6:30 A.M., Wright began to mow the grass between the driveways, but nowhere else on his property. Two days later, at 6:45 A.M., he mowed the same area, waking Smith and Riley. On June 21, while Riley was cleaning the pool, Wright jumped on his lawn mower, and sprayed dirt, manure, and debris onto Smith’s property. On June 24, Smith’s parents, brother, and sister-in-law came over for an outdoor barbecue to celebrate Father’s Day. Wright started up a leaf blower around his driveway, blowing dirt over Smith’s yard and the food, forcing the party inside. Only when the wind changed and started blowing dirt at Wright did he stop.
On two days in July, one of Wright’s farm hands stalked and “glared” at Riley, who was “scared to death.” At another outdoor party in August, this one to celebrate Riley’s father’s seventy-fifth birthday, thirty guests came, some from Vermont and Florida. It was windy, and Wright started an industrialized leaf blower where there were no leaves, and blew dirt into Smith’s pool and onto food tables, again sending the partygoers into the house. Smith felt angry, humiliated, and “shattered” and that she “couldn’t have people over.” Riley, in turn, felt that his family watched him get “kicked by the neighborhood bully and all I could do was walk in the house and hide — humiliated.” Smith and Riley held no more family events at Smith’s home.
The following year brought little relief. One day in July, 2008, Riley and Smith were watching a Rambo DVD when Wright started playing rock ‘n’ roll music “very loud” from his barn so that they could no longer hear the television through the thumping vibration in the house. Riley went outside; seeing him, Wright turned up the music and started to dance. In November, 2008, Wright again cut Smith off in her car. And in January, 2009, Wright snowplowed his driveway where there was no snow, dragging the tractor bucket and slamming it on the ground — at 5:30 A.M. This occurred three or four times. Smith became sick to her stomach and could not sleep. Smith was always frightened as a result of these occurrences. She installed a security system, which cost between $1,000.00 and $2,000.00.
For his part, Wright testified at trial that he did not mow manure, but mulched it. He acknowledged, however, that if manure landed on the pool, the pool area, or Riley himself, “there wouldn’t be any difference” whether the manure was mowed or mulched. Wright also admitted that blowing manure onto another’s property, swerving a motor vehicle toward another person, blowing dirt and debris at a neighbor’s barbecue, trespassing, interfering with one’s quiet enjoyment of one’s property and playing loud music did not constitute generally accepted agricultural policy.
Smith sued Wright and Komeeka Farm for trespass to land (three counts), trespass to chattels (the greenhouse), conversion, intentional infliction of emotional distress, and nuisance. Wright and Komeeka Farm answered with a denial, and impleaded Riley for indemnification, alleging that any action they had taken was in reliance on statements made by Riley as Smith’s agent. Riley denied the third-party complaint and counterclaimed against Wright and Komeeka Farm for intentional infliction of severe emotional distress and nuisance, allegations which Wright and Komeeka Farm denied. As noted, the jury found for Smith against Wright and Komeeka Farm on her claims for trespass and conversion, but awarded no damages; *27 the jury did award damages for nuisance and intentional infliction of emotional distress against each defendant and against Wright only on Smith’s claim of trespass to the greenhouse. Riley prevailed on his claim for intentional infliction of emotional distress against Wright with no damages, but received damages on the claims for nuisance against each defendant.[3] In response to a special question, the jury also found that Riley was “acting with apparent authority with respect to his dealings with” Wright.[4]
1. Sufficiency of the Evidence. Wright and Komeeka Farm claim that the evidence did not warrant the verdicts. They filed motions for a directed verdict at the close of the plaintiffs case and again at the close of all the evidence, as well as an omnibus posttrial motion for a new trial and judgment notwithstanding the verdict, pursuant to Mass. R. Civ. R, Rule 50, all of which were denied. On a motion for judgment notwithstanding the verdict, it is “the judge’s task, taking into account all the evidence in its aspect most favorable to the plaintiff, to determine whether, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, the jury reasonably could return a verdict for the plaintiff.” Rubel v. Hayden, Harding & Buchanan, Inc., 15 Mass. App. Ct. 252, 254 (1983). We review the evidence on each damages verdict in accordance with that standard.
A. Nuisance. “The right of a private person to bring an action for an injury caused by a private nuisance is broad and apparently without limitation. A tenant has been allowed to maintain an action for a private nuisance. Sherman v. Fall River Iron Works Co., 2 Allen 524, 526 (1861).” H. Sacks & Sons, Inc. v. Metropolitan Dist. Comm’n, 20 Mass. App. Ct. 45, 47 (1985). Thus, both Smith as landowner and Riley as occupant had standing to sue. “The essence of a private nuisance action is some interference with the use and enjoyment of property. PROSSER & KEETON, TORTS §87, at 619 (5th ed. 1984). See Connerty v. Metropolitan Dist. Commn., 398 Mass. 140, 147 (1986). A private nuisance is actionable when a property owner creates, permits, or maintains a condition or activity on his property that causes a substantial and unreasonable interference with the use and enjoyment of the property of another. See Morash & Sons, Inc. v. Commonwealth, 363 Mass. 612, 616 (1973). Leary v. Boston, 20 Mass. App. Ct. 605, 609 (1985).” Asíala v. City of Fitchburg, 24 Mass. App. Ct. 13, 16-17 (1987). The judge similarly instructed the jury as well as on damages, without objection.
Smith and Riley attested to a litany of interferences with the enjoyment of their property, beginning with Wright, using Komeeka Farm equipment, dumping snow *28 on their driveway, and later, undertaking “excessive tractor usage” from early morning to late at night, creating the equivalent of “a constant earthquake,” according to Smith. This activity was followed in 2007 by mowing near the house at 6:45 A.M. (Tune 20), spraying dirt and manure onto Smith’s property as Riley was trying to clean the pool (June 21), blowing dirt with a leaf blower at the Father’s day barbecue (June 24), Komeeka Farm workers glaring at Riley (two days in July), and again blowing dirt with a leaf blower at the birthday party (August). The activity continued into 2008 with loud music causing the house to vibrate (July), and on into 2009 with unnecessary snow plowing of a cleared driveway and slamming the tractor bucket at 5:30 A.M. over several days. Smith and Riley characterized their reactions as anxious, unable to sleep, “scared to death,” “shattered,” unable to entertain guests, angry, humiliated, sick to their stomachs, and always frightened.
Wright and Komeeka Farm argue that their activity was protected by G.L.c. 243, §6, which the trial judge summarized to the jury and which states:
No action in nuisance may be maintained against any person or entity resulting from the operation of a farm or any ancillary or related activities thereof, if said operation is an ordinary aspect of said farming operation or ancillary or related activity; provided, however, that said farm shall have been in operation for more than one year. This section shall not apply if the nuisance is determined to exist as the result of negligent conduct or actions inconsistent with generally accepted agricultural practices. For the purposes of this section, ‘agriculture’ and ‘farming’ shall be as defined in section one A of chapter one hundred and twenty-eight.”[5]
However, Wright acknowledged in his testimony that none of the foregoing activities were consistent with “generally accepted agricultural practices.” Accordingly, the jury could have properly found that the actions of Wright and Komeeka Farm caused a substantial and unreasonable interference with Smith’s and Riley’s use and enjoyment of their property. Moreover, on “a proper showing of independent personal injury, ... damages for emotional distress caused by a nuisance may be entirely appropriate,” including “damages for a nervous condition and for distress and discomfort resulting from private nuisances constituting continuing trespasses.” Harrison v. Textron, Inc., 367 Mass. 540, 556, n.13 (1975) (noting that in Proulx v. Basbanes, 354 Mass. 559, 562 (1968), “damages were allowed where the defendant’s machinery caused the plaintiffs’ property to vibrate, making the plaintiffs nervous and upset”). The verdicts for nuisance were supported by the evidence.
*29 B. Intentional Infliction of Emotional Distress. Again without objection, the trial judge correctly charged the jury in accordance with Agis v. Howard Johnson Co., 371 Mass. 140 (1976), namely, that in order for a plaintiff to prevail in a case for intentional infliction of emotional distress, it
must be shown (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct, RESTATEMENT (SECOND) OFTORTS §46, comment i (1965); Savage v. Boies, 77 Ariz. 355 (1954); Samms v. Eccles, 11 Utah 2d 289, 293 (1961); (2) that the conduct was ‘extreme and outrageous,’ was ‘beyond all possible bounds of decency’ and was ‘utterly intolerable in a civilized community,’ RESTATEMENT (SECOND) OF TORTS §46, comment d (1965); George v. Jordan Marsh Co., 359 Mass. 244, 254 255 (1971); (3) that the actions of the defendant were the cause of the plaintiff’s distress, Spackman v. Good, 245 Cal. App. 2d 518 (1966); Womack v. Eldridge, 215 Va. 338, 341 (1974); and (4) that the emotional distress sustained by the plaintiff was ‘severe’ and of a nature ‘that no reasonable man could be expected to endure it.’ RESTATEMENT (SECOND) OFTORTS §46, comment j (1965); Womack v. Eldridge, supra.
Id. at 144-145. Smith testified to actions by Wright (twice nearly cutting her off in her car, upsetting her backyard parties) and by Komeeka Farm’s employees (“cursing and heckling and spitting” in her presence and staring at her as she was trying to enjoy her swimming pool, scaring her into her house and intimidating her). The jury could have inferred that Wright and Komeeka Farm acted intentionally from the attendant circumstances of their actions. Commonwealth v. Blake, 409 Mass. 146, 150 (1991). As for the remaining elements, what for one person may be extreme and outrageous behavior causing a level of unreasonably unendurable distress may not be such for another person with a different level of tolerance. Weighing for any given claimant the level of recoverable infliction of emotional distress necessarily requires application of the so-called “‘eggshell’ plaintiff rule,” Doty v. Sewal, 908 F.2d 1053, 1059 (1st Cir. 1990), often described as the “tort concept of ‘you take your victim as you find him.’” Commonwealth v. Carlson, 447 Mass. 79, 85 (2006). In Agis v. Howard Johnson Co., for example, the plaintiff complained of a single incident in which at a meeting of employees, a manager complained of stealing at the work site and stated that until the thief was found he would begin firing the employees in alphabetical order, starting with the plaintiff, who “became greatly upset, began to cry, sustained emotional distress ... [and] mental anguish.” Id at 141. The Supreme Judicial Court held that Agis had made out a cause of action. By contrast, Smith presented evidence of a course of conduct extending over years. Thereafter, whether one’s actions inflict emotional distress on another is a function best left to the fact finder.
The jury is ordinarily in a better position... to determine whether outrageous conduct results in mental distress than whether that distress in turn results in physical injury. From their own experience jurors are aware of the extent and character of the disagreeable emotions that may result from *30 the defendant’s conduct, but a difficult medical question is presented when it must be determined if emotional distress resulted in physical injury. ... Greater proof that mental suffering occurred is found in the defendant’s conduct designed to bring it about than in physical injury that may or may not have resulted therefrom.
Id. at 144, quoting State Rubbish Collectors Ass’n v. Siliznoff, 38 Cal. 2d 330, 338 (1952). It is not for an appellate court to attempt to decipher on the record whether Wright and Komeeka Farm caused emotional distress or that Smith was simply unduly sensitive. The jury’s finding on the evidence presented that the actions of Wright and Komeeka Farm caused Smith to be frightened and intimidated, resulting in emotional distress, will not be disturbed.
C. Trespass to Chattels. What was alleged in the complaint as trespass to chattels became more specifically “trespass to greenhouse” on the verdict slip. The complaint alleged that Wright entered onto Smith’s land and “damaged or caused to be damaged the greenhouse rendering the greenhouse worthless and additionally did remove items, equipment and/or materials associated with the greenhouse from [Smith’s] property.” The jury returned a verdict for Smith in the sum of $11,290.00. “Recovery or relief for trespass or injury to a chattel (as contrasted with wrongful removal or deprivation of possession) is ordinarily possible only where physical harm is shown. RESTATEMENT: TORTS, §§218, 219, 220, comments b, f. See HARPER AND JAMES, LAW OF TORTS, §2.3, and cases cited.” New England Tel. & Tel. Co. v. National Merchandising Corp., 335 Mass. 658, 664 (1957). The Restatement gives a broader definition:
One who commits a trespass to chattels is subject to liability to the possessor of the chattel if, but only if, (a) he dispossesses the other of the chattel, or (b) the chattel is impaired as to its condition, quality, or value, or (c) the possessor is deprived of the use of the chattel for a substantial time, or (d) bodily harm is caused to the possessor, or harm is caused to some person or thing in which the possessor has a legally protected interest.
RESTATEMENT, SECOND, TORTS §218 (1965). See also Spooner v. Manchester, 133 Mass. 270, 272 (1882). The trial judge, without objection, instructed the jury substantially in accordance with this statement of the law. Smith’s evidence, which the jury credited, was that Wright sent Linnell, without permission, onto Smith’s land to disassemble the greenhouse and take away part of it, leaving behind exposed equipment, plumbing, electrical, and construction parts, and, as Riley described, “everything else basically mangled.” The evidence was sufficient to support the claim of trespass to chattels.
2. Damages. For the first time on appeal, Wright and Komeeka Farm argue that the proper measure of damages in a nuisance case is the loss of fair rental value. See, e.g., Harrison, supra at 556. The judge gave separate instructions on damages for each count in the complaint, without objection, and without any request from either Wright or Komeeka Farm for a charge on rental value. “No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he *31 objects and the grounds of his objection.” Mass. R. Civ. P., Rule 51(b). The issue is waived.[6]
3. Jury Instruction. During their deliberations, the jurors asked about the difference between nuisance and emotional distress and how to determine damages, costs, and attorney’s fees. The judge informed counsel that he would repeat the instructions on those claims as well as on damages, and in fact did so. Counsel for Wright and Komeeka Farm said before the supplemental instructions that the “proposed statements to the jury make sense” and interposed no objection afterward. Wright and Komeeka Farm now argue that they were harmed by the rereading, but do not say how; in any event, their acquiescence in the charge waives their right to contest it now. Mass. R. Civ. P., Rule 51(b).
4. Excluded Evidence. Before commencement of the trial, Smith moved in limine to preclude the defendants from offering the testimony of Wayne Wiegand (‘Wiegand”), who had sold the property to her. Wright’s counsel proffered that Wiegand would testify “to the fact that [Smith] wanted the greenhouse off the property, got him to reduce his price by $10,000 because she didn’t want it there.” He would also “testify to the condition of it prior to the partial dismantling.” Smith’s counsel responded that there was no direct communication between Smith or Riley and Wiegand, and that all communications were relayed through the broker and were hearsay, and that six months had elapsed between the sale and the action on the greenhouse. The court allowed the motion to preclude Wiegand’s testimony. The condition of the greenhouse six months prior to the sale was of doubtful relevance. Further, the proffered testimony as to what Smith told the broker as relayed by a third party’s conversation with the broker was clearly hearsay, to wit, “a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” Mass. G. Evid. §801 (c) (2012). As “[h]earsay is generally inadmissible unless it falls within an exception to *32 the hearsay rule as provided by case law, statute, or rule prescribed by the Supreme Judicial Court,” id. at §802; see Commonwealth v. Rice, 441 Mass. 291, 305 (2004), and as no hearsay exception was cited for its admissibility, allowance of the motion to exclude the Wiegand testimony was not error.
5. Komeeka Farm as an Independent Entity. Komeeka Farm argues that it is not an independent entity and is nothing more than a trade name for Wright as a sole proprietor, and that the jury award against Wright and Komeeka Farm is duplicative. The issue was raised for the first time in the omnibus posttrial motion with no supporting documentation. Until that moment, both defendants were treated as separate parties. Smith’s complaint stated, ‘The Defendant, Komeeka Farm & Equestrian Center is a business operation located at 89A Red Gate Road, Middlesex County.” The answer admitted the allegation. The responding paragraph in the answer referred to Wright and Komeeka as “Defendants.” No defense was asserted or motion filed seeking to dismiss for misnomer of a party. Mass. R. Civ. R, Rule 12(b) (8). At the beginning of the trial, defense counsel told the clerk that the name of the case was “Smith versus Wright and Komeeka Farm.” At the beginning of his cross-examination of Smith, he stated, “I represent Eric Wright and Komeeka Farm.” In his closing, counsel referred to his “clients, Eric Wright and Komeeka Farm.” Wright testified that Komeeka Farm was an “operating enterprise” before he bought the property, and that some of the agricultural equipment belonged to him and some to Komeeka Farm. Throughout the entire litigation, until the time of the posttrial motion, Wright and Komeeka Farm were characterized as distinct parties. Finally, the agreed upon verdict slip called for separate verdicts as to Wright and Komeeka Farm and “precluded any possible error or prejudice.” Hobbs v. TLT Constr. Corp., 78 Mass. App. Ct. 178, 180 (2010).[7]
6. Motion for New Trial. “Ruling on a motion for a new trial presents a limited question of fact, because the judge should not decide the case as if sitting without a jury; rather, the judge should only set aside the verdict if satisfied that the jury ‘failed to exercise an honest and reasonable judgment in accordance with the controlling principles of law.’” Robertson v. Gaston Snow & Ely Bartlett, 404 Mass. 515, 520 (1989), quoting Hartmann v. Boston Herald-Traveler Corp., 323 Mass. 56, 60 (1948). As above demonstrated, there is nothing to indicate that the jury so failed. Moreover, “the application of this standard is within the sound discretion of the trial judge and the grant or denial of a new trial will be disturbed only if there has been an abuse of that discretion.” Id. at 520-521. We find no abuse.
Judgment affirmed.
So ordered.

 Smith and Riley were married in May, 2008.

 Verdicts for the defendants were returned on Smith’s conversion counts against both defendants, her trespass to greenhouse claim against Komeeka Farm, and Riley’s claim for intentional infliction of emotional distress against Komeeka Farm.

 This finding is a bit of an oddity. As noted, the gravamen of Wright and Komeeka Farm’s third-party complaint was in the nature of indemnity, to wit, that Wright’s actions, presumably in dismantling the greenhouse, were taken in reliance on statements made by Riley, acting on behalf of Smith, and that Riley was ultimately liable for any judgment Smith obtained. By their verdict, the jurors evidently concluded that Riley had apparent authority, but even with that authority, he had not given permission to tear down the greenhouse. In any event, the issue is not raised on appeal.

 General Laws c. 128, §1A, in turn, provides in relevant part: “‘Farming’ or ‘agriculture’ shall include... the raising of livestock including horses, the keeping of horses as a commercial enterprise ..., performed by a farmer, who is hereby defined as one engaged in agriculture or farming as herein defined, or on a farm as an incident to or in conjunction with such farming operations, including preparations for market, delivery to storage or to market or to carriers for transportation to market.”

 The jury awarded Smith $25,000.00 against Wright for nuisance, another $25,000.00 against Komeeka Farm for nuisance, another $25,000.00 against Wright for emotional distress, another $25,000.00 against Komeeka Farm for emotional distress, and $11,290.00 against Wright for trespass to the greenhouse. The jury awarded Riley $12,500.00 against Wright for nuisance and another $12,500.00 against Komeeka Farm for nuisance. In their omnibus posttrial motions, the defendants requested a remittitur, but did not specify why the damages awarded were unfounded or excessive. Nor do they challenge the amount of damages on appeal. Since the issue was addressed somewhat at oral argument, we note only that it is not the role of an appellate court to speculate whether the jury intended its awards to be joint and several or separate as to each defendant. The completed verdict slip, the form of which was agreed to by all parties, shows separate awards for each plaintiff against each defendant. “The trial judge’s instructions and verdict slip (which has the status of an instruction to the jury) reflect a measured and responsible attempt to discern some reasonable view of the case which allowed for different possible findings of fault against the separate defendants.” Hobbs v. TLT Constr. Corp., 78 Mass. App. Ct. 178, 180 (2010). And with no objection under Mass. R. Civ. R, Rule 51(b), having been advanced, the issue was not preserved.

 Collection of the judgment may prove difficult if the business name is incorrect, but that concern must rest with Smith and Riley.