[Civ. No. 9281. Fourth Dist., Div. Two. Aug. 7, 1970.]

U. L. FLETCHER, Plaintiff and Respondent, v.
WESTERN NATIONAL LIFE INSURANCE CO. et al.,
Defendants and Appellants.

380

382

**COUNSEL**

Chandler P. Ward and Edward L. Lascher for Defendants and Appellants.

Kaplan, Livingston, Goodwin, Berkowitz & Selvin and Herman F. Selvin as Amici Curiae on behalf of Defendants and Appellants.

Young, Prenner & Hews, Arthur N. Hews and Ronald H. Prenner for Plaintiff and Respondent.

**OPINION**

**KAUFMAN, J.**—This controversy arises out of the conduct of defendants Western National Life Insurance Company (hereinafter Western National) and its claims supervisor Tom R. Amason, with respect to a disability insurance policy issued by Western National to plaintiff.

The complaint, as amended, consisted of three counts. The first sought a declaration that plaintiff was entitled to monthly payments of $150 under the "injury" provision of the policy so long as plaintiff should be totally disabled, up to a maximum of 30 years. The second sought compensatory and punitive damages against both defendants for their alleged fraud in inducing plaintiff to buy the policy. The third sought compensatory and punitive damages against both defendants for their alleged intentional infliction upon the plaintiff of emotional distress.[1]

---

[1]Actually, the third cause of action was pleaded on the theory of a conspiracy between defendants Amason and Western National. In a discussion in chambers

At the commencement of a jury trial, defendant Western National stipulated to judgment in favor of plaintiff on the first cause of action for declaratory relief, and the case proceeded to trial on the second and third causes. At the conclusion of plaintiff's case, the court granted defendants' motions for nonsuit with respect to the second cause of action for fraud in the inducement.[2]

The case was submitted to the jury on the third cause of action for intentional infliction of emotional distress. The jury returned a verdict in favor of plaintiff, awarding him $710,000 in damages: $60,000 compensatory damages, $10,000 punitive damages against defendant Amason, and $640,000 punitive damages against defendant Western National. Defendants moved for judgment notwithstanding the verdict and for a new trial. The motions for judgment notwithstanding the verdict were denied, as was defendant Amason's motion for new trial.

Western National's motion for a new trial was conditionally granted on the ground of excessive damages. Plaintiff, however, accepted a remission of the punitive damage award against Western National to the sum of $180,000, and the motion for new trial was thereupon denied. Defendants appeal from the judgment, as modified, and from the order denying their motions for judgment notwithstanding the verdict. (Code Civ. Proc., § 904.1, subd. (d).)

### Defendants' Contentions

Defendants' contentions are numerous, but, basically group themselves into four major propositions: first, that defendants' motions for judgment notwithstanding the verdict should have been granted because plaintiff failed to prove facts constituting a prima facie case of intentional infliction of emotional distress; second, that, fundamentally, plaintiff's action sounds in contract and that, therefore, punitive damages were impermissible in this

---

prior to the taking of testimony it was apparently concluded that there could be no conspiracy between the corporate defendant and its employee acting within the scope of his employment (see *Wise* v. *Southern Pac. Co.*, 223 Cal.App.2d 50, 72 [35 Cal. Rptr. 652]), and the case proceeded as if the third count had pleaded tortious conduct by both defendants.

[2]The nonsuit was granted as to defendant Amason because it appeared that he had nothing whatever to do with the issuance of the policy. Western National's motion was granted because of the trial court's belief that plaintiff had failed to introduce evidence to establish that one Bale, who interested plaintiff in and sold him the policy, was the agent of Western National. Evidence of agency appears, however, from the application attached to and made a part of the policy by Western National, and in the other documentary evidence; and in appellants' statement of facts in their opening brief they state that the policy was purchased through an agent of Western National. After the nonsuit, plaintiff dismissed the fraud cause of action as to both defendants.

case and that, in any event, Civil Code, section 3294 authorizing punitive damages is unconstitutionally vague; third, that prejudicial error is to be found in the jury instructions; and fourth, that the damage awards, both compensatory and punitive, are excessive.

### Denial of Judgment Notwithstanding the Verdict

A motion for judgment notwithstanding the verdict may be granted only if a motion for a directed verdict should have been granted. (Code Civ. Proc., § 629; *Vargas* v. *Ruggiero,* 197 Cal.App.2d 709, 714 [17 Cal.Rptr. 568].) ■ The court's power to direct a verdict is the same as its power to grant a nonsuit. (*Gindraux* v. *Maurice Mercantile Co.,* 4 Cal.2d 206, 208-209 [47 P.2d 708]; *Vargas* v. *Ruggiero, supra.*) ■ " 'A nonsuit may be granted only where, disregarding conflicting evidence on behalf of the defendants and giving to plaintiff's evidence all the value to which it is legally entitled, therein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff. [Citations.] . . . on any tenable theory of liability.' " (*Vargas* v. *Ruggiero, supra; Estate of Lances,* 216 Cal. 397, 400-401 [14 P.2d 768].)

### The Facts

At the time of trial in February 1968, plaintiff was 41 years old, had been married 20 years and was the father of 8 children ranging in age from 8 to 19 years, 7 of whom were then attending school. Plaintiff has only a fourth grade education, and prior to his disablement, was employed as a scrap operator for a rubber company, which employment required heavy manual labor. He was earning approximately $289 per week by working 70 to 80 hours per week.

In 1963 plaintiff was interested in purchasing several types of insurance protection for himself and his family, including disability insurance, and purchased the subject disability insurance policy from defendant Western National. The policy provided for payments of $150 per month to plaintiff should he become totally disabled because of sickness or injury. In the event of sickness, such payments were limited to a maximum period of two years. In the event of injury, the maximum period of payment was 30 years.

Plaintiff paid the premiums on the policy regularly, and it was in force in January 1965 when he had an accident at work while lifting a 361-pound bale of rubber. He sustained various injuries, generally in the area of his low back and legs. In the course of the medical examinations related to the accident, it was discovered that plaintiff had a hernia for which he was

surgically treated. This kept him off work intermittently until June 8, 1965. When he returned to work after the hernia operation, he continued to have trouble with his back and was eventually placed on disability by his physician and terminated by his employer on or about June 28, 1965.

Plaintiff filed a workmen's compensation claim and, as a result, was examined and treated by a considerable number of doctors, including an independent medical examiner. It would unduly prolong this opinion to set forth the findings of each of the physicians. It is fair to say, however, that there was virtually unanimous agreement that plaintiff was disabled because of an injury to his back resulting from the accident of January 1965. Some of the diagnoses were reported to Western National on its proof of loss or continuation of disability forms. Others became known to Western National through an investigation by a private investigator employed by it. Suffice it to say that almost all of the doctors' reports reached Western National's file in one form or another.

Late in 1965 plaintiff was hospitalized for a myelogram after which his attending physician and several consulting physicians recommended surgical fusion of a disc in his spine. These recommendations were based on the doctors' diagnoses of a herniated intervertebral disc with probable irritation of spinal nerves. With respect to this recommended surgery, on March 2, 1966, Western National received from its private investigator a letter from one of the·physicians responding to an inquiry by the investigator in which it was stated: "I am sure that you are well aware of the fact that Mr. Fletcher has a large family and if such surgery were performed subsequently his employment outlook would be very poor to say the least."

Shortly after the accident in January 1965, plaintiff filed with Western National a proof of loss, and the company promptly commenced monthly payments of $150 to plaintiff. During the period of time plaintiff was off work as a result of the hernia condition, payments were made under the sickness provision of the policy because, under the policy, disability due to hernia was payable as a sickness.

Western National was informed, however, that plaintiff returned to work on June 8, 1965, and that his difficulty thereafter related to his back. On August 25, 1965, plaintiff submitted to Western National another proof of loss containing a report from plaintiff's attending physician to the effect that plaintiff was disabled because of his back condition resulting from the injury in January 1965. Pursuant thereto, monthly payments to plaintiff were resumed, apparently under the injury provision, although plaintiff was not at that time notified under which provision of the policy payments were being continued.

In May 1966, defendant Amason became Western National's claims supervisor, and faced with the bleak prospect disclosed by the report from the private investigator, he, inferably, immediately set about to find some way of minimizing or avoiding plaintiff's claim.

Notwithstanding the innumerable medical reports indicating that the disability was attributable to plaintiff's back condition resulting from his injury in January 1965, the myelogram report, the diagnoses of herniated intervertebral disc and the recommendation of surgical fusion of the disc, Amason concluded that the claim should be paid under the sickness provision of the policy which exposed the company to liability for only two years as opposed to the injury provision which exposed the company to liability for 30 years, a difference in exposure of more than $50,000.

An interoffice memorandum prepared by Amason on May 17, 1966, discloses that he seized upon the diagnosis of one of the consulting physicians "acute derangement of low back, associated with irritation of the cauda equina,[3] probably associated with injury to a low lumbar intervertebral disc," and concluded "[a]n equinic condition is a mild form of glanders sometimes seen in man and contracted from horses. Therefore, it would appear we should pay this man under the sickness provision of his policy and not the accident provision."[4]

Accordingly, by letter dated June 13, 1966, defendants informed Mr. Fletcher that "due to the current diagnosis given by your attending physician, we are now paying your claim under the Sickness Provision of your policy."

Apparently not entirely satisfied with its decision to pay plaintiff's claim under the sickness provision on the conclusion that he was suffering from a condition which he may have contracted from a horse, defendants again wrote to plaintiff on August 5, 1966, informing him that: "An investigation has revealed that your present condition is one of congenital nature and not one of recent injury.

"Therefore, we are notifying you that we are paying you under the sickness provision of your policy and not under the accident provision. Had we known of your congenital back ailments at the onset of your claim, we would have notified you that you were being paid under the sickness provision and not the accident provision of your policy."

---

[3]Schmidt's Attorney's Dictionary of Medicine defines cauda equina as "[a] horse-tail-like aggregation of nerve fibers originating from the lower part of the spinal column, traveling for a short distance in the canal of the spine, . . . ."

[4]Amason testified that he obtained this definition by telephone from a physician retained by the company. He also apparently equated the diagnosis of herniated intervertebral disc with "hernia" under the policy.

This action was apparently based upon a statement in a report by one of the examining physicians that plaintiff's disability was contributed to by a preexistent congenital defect in the lumbosacral spine and a preexistent osteoarthritis condition. A photograph of this medical report was included in the report of the private investigator dated February 15, 1966, and was a part of Western National's file long before its letter to plaintiff dated June 13, 1966.

Thereafter, Western National continued making the monthly disability payments under the sickness provision of the policy through July 29, 1966, at which time it discontinued payments. In August 1966 defendants obtained a credit investigation with respect to plaintiff. The investigation was conducted on August 3 and August 8, 1966, and was apparently received in Western National's office in two parts on August 12 and August 18, 1966. In addition to confirming the continuing disability of the plaintiff, the report informed defendants that plaintiff then had a total income of $384 per month, consisting of $118 disability benefits from social security, $116 a month received from the rental of a house in Santa Ana and $150 from Western National. With respect to plaintiff's expenses it was reported that: "[A]ll of his income is going out to upkeep on his two homes, food for family and expenses and medical bills. He is barely making ends meet and has no idea of how many expenses he has exactly but stated generally that they were normal household and family expense which seem to be more than he can manage without slighting one or the other."[5]

Notwithstanding the complete absence of any investigation concerning the possible congenital defect, the complete absence of any facts indicating that the plaintiff knew about this condition, and in face of information that plaintiff denied any previous back trouble and any knowledge of any such preexisting condition, on August 25, 1966, after conferring with the president and other officers of Western National, and with the express approval of the president, Amason, on behalf of Western National, wrote to plaintiff a letter which read in pertinent part: "We have just completed making an intensive investigation of your disability claim. We were quite surprised to find you had a congenital back ailment which was not disclosed in your application.

"Nowhere in your Accident and Sickness Application did you inform us of your severe congenital defect in the low back. Had your answer to

---

[5]It was plaintiff's theory that this investigation was made by defendants to determine plaintiff's economic condition so that they could evaluate the likelihood of his legally resisting their contemplated effort to cause him to surrender his policy.

question (12a) *'To the best of your knowledge and belief have you ever had or been under observation for any disease or disorder: (a) of the brain or nervous system (convulsions, nervous breakdown, insanity, loss of consciousness, spinal disease or paralysis included)?'*, of your Accident and Sickness Application been 'yes', we would have had you examined prior to the issuance of your policy.[6]

"We consider such information material, and quite frankly, would not have issued you an Accident and Sickness Policy had we been aware of your true medical condition. Consequently, we feel there is definite misrepresentation on your part in not informing us of this condition. Based on this, we are contesting the validity of your Accident and Sickness insurance policy. We, therefore, must deny any liability under policy 122,197 and hereby made [*sic*] demand upon you for the sum of $2,250.00, less the amount of premiums you have actually paid to date. A copy of the aforementioned application is attached."

This letter was followed by another letter dated October 4, 1966, again written by Mr. Amason on behalf of Western National with the express approval and authorization of the president after conference with him and other officers of the company. In this second letter defendants admitted receiving through an agent plaintiff's denial of any knowledge of a preexisting back defect, but nevertheless reasserted their claim that he had made a material misrepresentation in his application. They indicated their willingness, however, "to make a compromise agreement" for the purpose of avoiding "further cost of litigation." They proposed to allow plaintiff to keep the payments already made to him, $2,250, in consideration of the cancellation of the policy and the execution by plaintiff of a full release. The letter concluded: "Failure to return this signed agreement and your A & S policy No. 122,197 within ten (10) days shall be considered a refusal to do so and an unwillingness on your part to compromise this claim and our offer will then automaticly [*sic*] terminate and we shall once again demand full reimbursement of the $2,038.48.

"It is only fair to tell you that if we have to, we are willing to take whatever action necessary to have this policy cancelled. The action, however, is expensive to both parties and it is only for this reason we wish to effect a compromise settlement at this time."

Plaintiff turned this letter over to his attorney, who on October 13, 1966, wrote to defendants demanding that disability payments under the policy be resumed and pointing out the complete absence of any facts indicating plaintiff's knowledge of any preexisting congenital back defect.

---

[6]The testimony revealed that, in fact, Western National did have plaintiff examined by a physician prior to the issuance of the policy.

Defendants replied to this letter by letter of November 1, 1966, in which they renewed their offer to "settle" on the terms set forth in their letter of October 4, 1966. After some negotiations with plaintiff's attorney, by letter dated December 16, 1966, defendants offered to pay plaintiff the sum of $2,850 in addition to all amounts theretofore paid in exchange for a cancellation of the policy and a release. By letter of January 10, 1967, plaintiff's attorney rejected this proposal, again insisting on plaintiff's right to continued disability payments under the policy and bringing to defendants' attention the case of *Wetherbee* v. *United Ins. Co. of America* (subsequently reported at 265 Cal.App.2d 921 [71 Cal.Rptr. 764]) which had recently been tried, resulting in a judgment for the policyholder of $500,000 punitive damages.

After receipt of that letter, on January 20, 1967, Amason, on behalf of Western National, wrote a letter to plaintiff's attorney which read in part: "Thank you for your letter of January 10, 1967, about Mr. Fletcher's disability claim.

"After a thorough investigation of Mr. Fletcher's claim, we feel there might be some grounds for our resuming of payments on this claim. As you know, the reason we stopped making payments on this claim was because an investigation revealed we might have material representation. [*sic*] in this case as Mr. Fletcher failed to notify us in his application of his congenital back condition. *After Mr. Fletcher's retention of your services, we found out Mr. Fletcher was unaware of having any congenital back derangements or deformities.* (Italics added.)

"*Further investigations have revealed that Mr. Fletcher is presently suffering from an invertebral* [sic] *herniated disc, which he is presently being treated for.*" (Italics added.)

Mr. Amason admitted in his testimony that defendants had received no new information after Mr. Fletcher's retention of the attorney's services and that there had been no new investigation. Notwithstanding the statements in this letter, disability payments under the policy still were not resumed, allegedly because of defendants' need for further medical information.

Defendants' letter of January 20, 1967, was turned over to plaintiff's litigation attorney, to whom he had been referred by the attorney previously consulted. On February 8, 1967, the litigation attorney informed defendants by letter of plaintiff's intention to file suit, and the present action was filed on February 20, 1967.

On April 10, 1967, after being served with the summons and complaint on March 3, Western National finally resumed disability payments to plaintiff, forwarding a draft in the amount of $1,200 covering the period July 30, 1966, to March 29, 1967. On or about May 9, 1967, Western National forwarded to plaintiff a draft in the amount of $150 for the period March 30, 1967, to April 29, 1967. This draft bore a recital, "Full and Final Settlement under Sickness Provision." Defendant Amason denied having anything to do with that recital being placed on the draft, but a copy of the draft is found in Western National's file which was maintained by Amason. After some correspondence between plaintiff's litigation attorney and defendants and their attorneys, plaintiff declined to negotiate this draft.

Thereafter, despite repeated demands by plaintiff's litigation attorney, Western National made no further payments to plaintiff until November 16, 1967, at which time it forwarded to him a draft in the amount of $1,050, covering the period April 30 to November 29, 1967. This payment was made pursuant to the injury provision of the policy, and, of course, on the day of trial, defendant Western National stipulated to a declaratory judgment on the first cause of action that plaintiff was entitled to continuing payments of $150 per month under the injury provision of the policy so long as he should remain totally disabled up to a maximum of 30 years.

Viewed most favorably to plaintiff, the foregoing facts and inferences to be drawn therefrom establish that defendants, without probable cause for believing that plaintiff had made an intentional material misrepresentation or that his disability was due to anything other than his injury in January 1965, embarked upon a concerted course of conduct to induce plaintiff to surrender his insurance policy or enter into a disadvantageous "settlement" of a nonexistent dispute by means of false and threatening letters and the employment of economic pressure based upon his disabled and, therefore impecunious, condition, (the very thing insured against) exacerbated by Western National's malicious and bad faith refusal to pay plaintiff's legitimate claim. Defendants concede that their conduct was "deplorable" and "outrageous."

Near the conclusion of the case, Mr. Amason, who was at the time of trial still employed as Western National's claims supervisor, was asked whether if he had another claim with identical facts, circumstances and file, he "[w]ould . . . go . . . through the same routine again that [he] went through with Mr. Fletcher?" His answer was "Yes, sir."

With respect to the effects on plaintiff of defendants' conduct, plaintiff's testimony, stated most favorably to him, may be summarized as follows.

With respect to the letter of June 13, 1966, he did not understand what was meant by the statement "due to the current diagnosis given by your attending physician," we are now paying your claim under the Sickness Provision of your policy, and he was not upset by the letter.

With respect to the letter of August 25, 1966, he testified that "it was real disturbing to me. . . . It was very discouraging to me. . . . Well, I felt two, maybe three different things. I felt I was jeopardizing $150 per month even though it included my home, losing my home, and also my family going on lacking of food. So I was pretty well upset." He further testified on cross-examination in substance that he was further upset by the accusation that he had made a knowingly false misrepresentation and by the facts that, from the word "demand," he felt he was going to be sued and that defendants were demanding from him a lump sum which he had no ability to pay.

Upon receipt of the letter of August 25, plaintiff got in touch with Mr. Bale, the person through whom he had purchased the policy. Mr. Bale initially told plaintiff that he would write a letter to the company to see if he could get the matter straightened out. Having had no further communication, plaintiff again called Mr. Bale two or three weeks later and was told that the company had definite proof that plaintiff was not entitled to the payments. Plaintiff indicated to Mr. Bale that he had no knowledge of any preexisting condition and pointed out that he had spent more than seven years in the army and received a complete physical checkup before discharge and, also, that he had been given a thorough examination by the rubber company when he went to work for it. Mr. Amason admitted in his testimony that Mr. Bale had transmitted this information to Western National.

When asked what he did between the time he last talked to Mr. Bale and the time he received Amason's letter of October 4, 1966, plaintiff answered, "I didn't do anything in between but try to figure out a way of earning some other money of some sort to support my family." He was then asked the effect upon his family life of the cessation of payments from Western National after the letter of August 25, 1966. He answered, "Well, sir, the only thing that I can say that I know that the family had gone lacking lots of different things as far as food and clothes, and also I have, you know, my house payment has been delinquent also, and I had to pay late charges and interest on that. And it has been as late as two and three months at a time." He testified that a further effect was his loss of a property in Arizona in which he had invested and on which he was making regular monthly payments.

With respect to Amason's letter of October 4, 1966, Mr. Fletcher testi-

fied that he was very upset about the letter because it asserted that he had a congenital back condition which he knew nothing about and accused him of misrepresentation. Upon receipt of that letter, he took it to his attorney and turned the matter over to him at that time.

As to the effects of Western National's nonpayment during 1967, Mr. Fletcher testified that he reduced his budget and kept trying to provide for his family; that he and his family were required to eat macaroni, beans and potatoes; that he gained 47 pounds; that during the summer of 1967 his utilities were turned off for nonpayment of charges and that he was required to "gather" money from friends and neighbors to have them turned back on; that his house payments were delinquent; that his wife was required to go to work two days a week; and that, as a result, he had to take one of his daughters out of school to tend to him and one small child for approximately two months on those two days a week that his wife worked.

*Discussion*

■ The elements of a prima facie case for the tort of intentional infliction of emotional distress are: (1) outrageous conduct by the defendant; (2) the defendant's intention of causing or reckless disregard of the probability of causing emotional distress; (3) the plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. (*Alcorn v. Anbro Engineering, Inc.,* 2 Cal.3d 493, 497-498 [86 Cal.Rptr. 88, 468 P.2d 216]; *State Rubbish etc. Assn.* v. *Siliznoff,* 38 Cal.2d 330, 337-339 [240 P.2d 282]; *Spackman* v. *Good,* 245 Cal.App.2d 518, 528-529, 531-534 [54 Cal.Rptr. 78]; Rest.2d Torts, § 46.) Whether treated as an element of the prima facie case or as a matter of defense, it must also appear that the defendants' conduct was unprivileged. (*Agostini* v. *Strycula,* 231 Cal.App.2d 804, 808 [42 Cal.Rptr. 314]; *State Rubbish etc. Assn.* v. *Siliznoff, supra,* at p. 339; Rest.2d Torts, *supra,* § 46, com. *g.*)

Defendants concede that their conduct was outrageous and that the evidence is sufficient to support the jury's implied finding of the requisite intent or recklessness. They contend, however, that their conduct was privileged in that it constituted settlement negotiations; that there is no evidence that plaintiff suffered emotional distress of sufficient severity to establish the tort; and that if plaintiff's emotional distress was of sufficient severity, there was no evidence that such was caused by defendant's conduct,

which conduct defendants urge must be restricted to the writing of the letters of August 25 and October 4, 1966.[7]

*Privilege*

Defendants urge that, notwithstanding the outrageous nature of their conduct, no liability can be predicated upon a communication from one contracting party to another relating to the resolution of a dispute over their contract. They rely upon the numerous authorities acknowledging the existence of a public policy in favor of the amicable settlement of disputes, including the rule prohibiting introduction into evidence of settlement negotiations, and they question whether the letters of August 25 and October 4, 1966, should even have been received into evidence. They urge that a rule which would predicate liability upon settlement negotiation communications would discourage insurance companies from engaging in such negotiations which would be contrary to sound policy.

■ Undoubtedly an insurance company is privileged, in pursuing its own economic interests, to assert in a permissible way its legal rights and to communicate its position in good faith to its insured even though it is substantially certain that in so doing emotional distress will be caused. (Rest.2d Torts, § 46, com. *g.* and illus. 14; cf. Rest. Torts, § 773; and see generally Prosser, Law of Torts [3d ed. 1964], Privilege, pp. 99-100.) The social utility served by recognition of this privilege is obviously enhanced when the privilege is exercised in connection with settlement negotiations, which are certainly to be encouraged. (See generally Prosser, Law of Torts, *supra,* Privilege, pp. 99-100.)

Nevertheless, the exercise of the privilege to assert one's legal rights must be done in a permissible way and with a good faith belief in the existence of the rights asserted. (Rest.2d Torts, § 46, com. *g., supra;* cf. Rest. Torts, § 773, *supra,* com. *a.*) ■ It is well established that one who, in exercising the privilege of asserting his own economic interests, acts in an outrageous manner may be held liable for intentional infliction of emotional distress. (*Vargas* v. *Ruggiero, supra,* 197 Cal.App.2d 709; *Bowden* v. *Spiegel, Inc.,* 96 Cal.App.2d 793 [216 P.2d 571]; cf. *State Rubbish etc. Assn.* v. *Siliznoff, supra,* 38 Cal.2d 330; *Emden* v. *Vitz,* 88

[7]It is questionable whether the problem exposed by this latter contention is truly one of causation. The question is whether threatened and actual bad faith refusals to make payments under the policy, maliciously employed by defendants in concert with false and threatening communications for the purpose of causing plaintiff to surrender his policy may legally constitute "conduct" giving rise to a cause of action sounding in tort. Analytically, this problem might well be discussed in connection with the element of outrageous conduct, but is related to the problem of causation and, to facilitate presentation, it is treated in connection with the discussion of causation, *infra.*

Cal.App.2d 313 [198 P.2d 696]; see also *National Life & Acc. Ins. Co.* v. *Anderson,* 187 Okla. 180 [102 P.2d 141]; *Continental Cas. Co.* v. *Garrett,* 173 Miss. 676 [161 So. 753]; and Prosser, Law of Torts, *supra,* pp. 49-50.)

Even if it could be said that defendants were asserting their legal rights in good faith, they were not privileged to do so in an outrageous manner. ■ Moreover, viewed most favorably to plaintiff, the evidence indicates that there was no probable cause to believe that plaintiff had made a misrepresentation of material fact or that his disability was due to anything other than his injury in January 1965; that there was no good faith dispute concerning liability under the policy and that defendants invented the alleged dispute as a part of their scheme to deprive plaintiff of the benefits of his policy. Defendants concede in their opening brief that the jury impliedly found that defendants were not striving for settlement in good faith. Such implied finding is amply supported by the evidence and disposes of the argument based upon the public policy favoring settlement. ■ Settlement implies the existence of a good faith dispute, and there is no public policy in favor of an attempt to coerce settlement of a non-existent dispute by outrageous means.

■ Defendants' suggestion that their letters were improperly admitted into evidence is not meritorious. In the first place, no objection to their introduction was interposed at trial. In the second place, the letter dated August 25, 1966, contained no offer of settlement. In the third place, the applicable code provision (Evid. Code, § 1152) prohibits the introduction into evidence of an offer to compromise a claim *for the purpose of proving liability for that claim.* If the letter of October 4, 1966, were considered an offer to compromise, it would be an offer to compromise the claim of liability under the policy. Plaintiff, however, did not offer the letter to prove liability under the policy but, rather, as a part of his proof of the instrumentality of the tort. Section 1152, therefore, did not preclude its admission.

*"Severe" Emotional Distress*

"The emotional distress must in fact exist, and it must be severe." (Prosser, Law of Torts, *supra,* p. 51; Rest.2d Torts, *supra,* § 46, com. *j.*) We are referred to no case that adequately defines the term "severe" in this context. Defendant has cited *Alsteen* v. *Gehl,* 21 Wis.2d 349 [124 N.W.2d 312] in which the court states. "[t]he plaintiff must demonstrate that he was unable to function in his other relationships because of the emotional distress caused by defendant's conduct." (124 N.W.2d at p. 318.) ■ We do not believe that that statement represents the law in California, however, for it is well established here that recovery may be had for emotional

distress alone without resulting physical disability. (*Alcorn* v. *Anbro Engineering, Inc., supra,* 2 Cal.3d 493, 498; *Perati* v. *Atkinson,* 213 Cal.App.2d 472, 474 [28 Cal.Rptr. 898].)

The term "severe emotional distress" is discussed in comment *j* to section 46 of the Restatement Second, of Torts, *supra.* "Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and duration of the distress are factors to be considered in determining its severity." It appears, therefore, that in this context, "severe" means substantial or enduring as distinguished from trivial or transitory. Severe emotional distress means, then, emotional distress of such substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to endure it.

"It is for the court to determine whether on the evidence severe emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed." (Rest.2d Torts, § 46, com. *j., supra.*) It is our conclusion that there is sufficient evidence from which emotional distress of the requisite severity can be found and that there is substantial evidence to support the jury's determination that it in fact existed.[8]

Defendants urge that the testimony of plaintiff himself establishes at most that he was only mildly upset by defendants' conduct. We do not agree. Plaintiff has only a fourth grade education and, from an examination of his testimony, is not overly articulate. The jury and the trial judge, who denied the motion for judgment notwithstanding the verdict, observed plaintiff and heard his testimony and were, as a result, in a far better position than we to judge the severity of plaintiff's emotional distress. It is true that plaintiff's testimony did not indicate that he suffered any traumatic emotional distress of the character of shock, horror or nausea, but the requisite emotional distress may consist of any highly unpleasant mental reaction such as fright, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment or worry. (*Crisci* v. *Security Ins. Co.,* 66 Cal.2d 425, 433 [58 Cal.Rptr. 13, 426 P.2d 173]; Rest.2d Torts, § 46, com. *j., supra.*)

 Plaintiff's testimony gives rise to an inference that he was frightened, worried and upset by defendants' false charges against him of inten-

---

[8]The jury was informed by several instructions that for plaintiff to recover he must have suffered *severe* emotional distress and, by another instruction, that "[s]evere emotional distress does not include slight emotional disturbance or hurt feelings. . . ."

tional misrepresentation, by defendants' demand for repayment of a substantial sum of money impliedly threatening legal action against him and by the notification that the $150 monthly payments were being discontinued. As a result of defendants' communications, he was worried and anxious about losing his home and his family lacking food and clothing. Plaintiff's worry and anxiety were inferably substantial in quantity, especially in view of his disabled and impecunious condition, which was fully known to defendants when they acted. Susceptibility of the plaintiff to emotional distress and a defendant's awareness thereof, have often been mentioned as significant in determining liability. (See *Alcorn* v. *Anbro Engineering, Inc., supra,* 2 Cal.3d 493, 498, fn. 3 and authorities there cited.)

██ Moreover, as pointed out previously, the duration of the emotional distress is one of the factors to be considered in determining its severity. (Rest.2d Torts, § 46, com. *j., supra*), and the jury could reasonably infer that plaintiff's worry and anxiety persisted for many months following defendants' letter of August 25, 1966, during their continued recalcitrance. (Cf. the continuing conduct of the defendant in *Parrott* v. *Bank of America,* 97 Cal.App.2d 14, 24 [217 P.2d 89, 35 A.L.R.2d 263].)

Additionally, as characterized by defendants in their briefs, a number of "woeful occurrences" befell plaintiff: his family lacked food and clothing; his house payments became delinquent; he lost a parcel of real property in which he had invested in Arizona; he and his family found it necessary to subsist on macaroni, beans and potatoes from which plaintiff gained 47 pounds; his utilities were turned off and he had to "gather" money from friends and neighbors to get them turned back on; his wife was required to go to work; and one of his daughters had to miss school on the days the wife was working. It would not appear unreasonable that a person with a prior history of industry and concern for his family would suffer substantial emotional distress in the nature of grief, humiliation, embarrassment, chagrin, disappointment and worry as a result of these occurrences. Defendants urge that such emotional distress, however, resulted not from their conduct but from plaintiff's unfortunate economic situation. This argument goes to the question of causation, which we discuss below. In determining whether plaintiff actually suffered emotional distress of the requisite severity to establish the tort, we do not feel that the emotional distress inferably resulting from these occurrences must be ignored.

*Causation—Defendants' Conduct*

Although we do not know that it could be or ought to be segregated, we think it undeniable from his testimony, that a substantial part of plaintiff's

emotional distress resulted not from the receipt of the letters but from the threatened and actual discontinuance of payments by defendants and the resulting economic consequences.

Therefore, fundamental to defendants' contention that any severe emotional distress plaintiff may have suffered was not caused by their conduct but, rather, by plaintiff's unfortunate economic situation, is the premise stated by defendants that their conduct, the instrumentality of the tort, must be limited to the letters of August 25 and October 4, 1966. This premise is based upon two hypotheses: first, that plaintiff's theory of pleading and trial was that these two letters constituted the instrumentality of the tort; and second, that defendants' threatened and actual discontinuance of monthly disability payments due under the policy constitute only a breach of contract and that such conduct does not give rise to a cause of action sounding in tort.

The first hypothesis is not supported by the record. Although it is true that plaintiff's third cause of action greatly emphasized defendants' letters of August 25 and October 4, 1966 and alleged that they were acts done pursuant to an alleged conspiracy, it was also alleged therein by incorporation of paragraph VII of the first cause of action that, on August 25, 1966, Western National advised plaintiff that it would make no further payments under the policy and that, thereafter, although poorly pleaded, no such further payments were made.

Even if it were to be said that the theory of the pleadings was that the instrumentality of the tort consisted of the two letters, the case was fully tried, and, if the evidence established plaintiff's right to relief, the motions for judgment notwithstanding the verdict were properly denied. (*Zellner* v. *Wassman*, 184 Cal. 80, 87-88 [193 P. 84]; *Masero* v. *Bessolo*, 87 Cal.App. 262, 268-269.) The doctrine limiting a plaintiff to recovery on the theory of his pleadings has long since been repudiated. (*California Western States Life Ins. Co.* v. *Tucker*, 15 Cal.2d 69, 71 [98 P.2d 511]; *Campbell* v. *Veith*, 121 Cal.App.2d 729, 732 [264 P.2d 141]; see 2 Witkin, Cal. Procedure (1954), pp. 1166-1169.)

It is clear from the record that the case was tried by plaintiff's attorney on the theory that defendants' bad faith and malicious threatened and actual refusals to pay constituted a part of the instrumentality of the tort.[9]

---

[9]Amongst other indications found in the record, we note a statement made by plaintiff's attorney in response to an assertion by defendants' attorney that there was no showing of severe emotional distress resulting from the two letters. "We aren't dealing with the letter of August 25th or a letter of October 4th. We are dealing with the continuous conduct from the moment they cut him off until they reinstated him."

It is also clear that the trial judge treated defendants' entire course of conduct as the instrumentality of the tort. In several jury instructions, language requested by defendants' referring to the two letters was changed by the court to refer to "defendants' conduct."

The second hypothesis constitutes the most troublesome aspect of this case. It raises the question whether threatened and actual bad faith refusals to make payments under a disability insurance policy, maliciously employed by the insurer in concert with false and threatening communications, for the purpose of causing the insured to surrender his policy or disadvantageously settle a nonexistent dispute, may legally give rise to a cause of action for intentional infliction of emotional distress or some other cause of action sounding in tort.

■ It is well settled that punitive damages may not be recovered for breach of contract, even if the breach is willful, fraudulent or coupled with evil intent. (*Crogan* v. *Metz*, 47 Cal.2d 398, 405 [303 P.2d 1029]; see *Wetherbee* v. *United Ins. Co. of America, supra,* 265 Cal.App.2d 921, 928 and cases there reviewed; Civ. Code, §§ 3300 and 3302.) It has also been held that damages are not recoverable for mental suffering or injury to reputation resulting from breach of contract, although such recovery has generally been denied on the theory that such damages are too uncertain, speculative and remote. (*Westwater* v. *Grace Church,* 140 Cal. 339, 342 [73 P. 1055]; *Walpole* v. *Prefab Mfg. Co.,* 103 Cal.App.2d 472, 489 [230 P.2d 36]; but cf. *Westervelt* v. *McCullough,* 68 Cal.App. 198, 208-209 [228 P. 734].) Indeed, section 10111 of the Insurance Code provides that "In life or disability insurance, the only measure of liability and dammage is the sum or sums payable in the manner and at the times as provided in the policy . . . ."

On the other hand, if the action is one in tort, punitive damages may be recovered upon a proper showing of malice, fraud or oppression even though the conduct constituting the tort also involves a breach of contract. (*Acadia, California, Ltd.* v. *Herbert,* 54 Cal.2d 328, 336-337 [5 Cal.Rptr. 686, 353 P.2d 294]; *Chelini* v. *Nieri,* 32 Cal.2d 480, 486-487 [196 P.2d 915]; *Haigler* v. *Donnelly,* 18 Cal.2d 674, 680-681 [117 P.2d 331]; *Wetherbee* v. *United Ins. Co. of America, supra,* 265 Cal.App.2d 921, 928-929; *Sharp* v. *Automobile Club of So. Cal.,* 225 Cal.App.2d 648, 653 [37 Cal.Rptr. 585].) Likewise, if the conduct is tortious, damages for emotional distress may be recovered despite the fact that the conduct also involves a breach of contract. (*Crisci* v. *Security Ins. Co., supra,* 66 Cal.2d 425, 432-434; *Acadia, California, Ltd.* v. *Herbert, supra,* 54 Cal.2d 328, 336-337; *Taylor* v. *Marine Cooks & Stewards Assn.,* 117 Cal.App.2d 556, 562-563 [256 P.2d 595].) ■ When the case sounds in tort, Insur-

ance Code, section 10111 does not restrict recovery to the amounts due under the policy. (*Wetherbee* v. *United Ins. Co. of America, supra,* 265 Cal.App.2d 921, 927-929.)

An insurer owes to its insured an implied-in-law duty of good faith and fair dealing that it will do nothing to deprive the insured of the benefits of the policy. (*Crisci* v. *Security Ins. Co., supra,* at p. 429.) Included within this duty in the case of a liability insurance policy is the duty to act reasonably and in good faith to settle claims against the insured by a third person. (*Crisci* v. *Security Ins. Co., supra.*) The violation of that duty sounds in tort notwithstanding that it may also constitute a breach of contract. (*Crisci* v. *Security Ins. Co., supra,* at pp. 432-434 [disapproving *Critz* v. *Farmers Ins. Group,* 230 Cal.App.2d 788, 799 [41 Cal.Rptr. 401, 12 A.L.R.3d 1142] to the extent it might be interpreted to the contrary].) ■ We think that, similarly, the implied-in-law duty of good faith and fair dealing imposes upon a disability insurer a duty not to threaten to withhold or actually withhold payments, maliciously and without probable cause, for the purpose of injuring its insured by depriving him of the benefits of the policy. We think that, as in *Crisci,* the violation of that duty sounds in tort notwithstanding that it also constitutes a breach of contract. (Cf. also *Ward* v. *Taggart,* 51 Cal.2d 736, 743 [336 P.2d 534].)

In *Crisci,* the liability insurer unreasonably refused to settle and, after a judgment against the insured in excess of policy limits, refused to pay the excess. As a result the insured lost property and suffered emotional distress. Our high court, in a unanimous opinion, held that the insured could recover damages in tort for both the loss of property and her emotional distress. ■ "We are satisfied that a plaintiff who as a result of a defendant's tortious conduct loses his property and suffers mental distress may recover not only for the pecuniary loss but also for his mental distress." (*Crisci* v. *Security Ins. Co., supra,* 66 Cal.2d 425, 433-434.)

■ We hold, therefore, that defendants' threatened and actual bad faith refusals to make payments under the policy, maliciously employed by defendants in concert with false and threatening communications directed to plaintiff for the purpose of causing him to surrender his policy or disadvantageously settle a nonexistent dispute is essentially tortious in nature and is conduct that may legally be the basis for an action for damages for intentional infliction of emotional distress. We further hold that, independent of the tort of intentional infliction of emotional distress, such conduct on the part of a disability insurer constitutes a tortious interference with a protected property interest of its insured for which damages may be recovered to compensate for all detriment proximately resulting there-

from, including economic loss as well as emotional distress resulting from the conduct or from the economic losses caused by the conduct, and, in a proper case, punitive damages.

Although it might be possible to rest our decision solely upon the first holding, we make the latter holding because we believe that it squares with the economic, social and legal realities of the problem presented. The tortious conduct in this case has resulted, and could be expected to result, in both economic loss[10] and emotional distress. The emotional distress resulted, and could be expected to result, from both the immediate conduct of defendants and the economic losses caused by their conduct. Indeed, in a case such as this, the invasion of economic interests might well outweigh the direct invasion of emotional tranquility. ▆▆▆ The tort of intentional infliction of emotional distress is designed to redress primarily invasions of the personal interest in emotional tranquility, not economic losses, unless, of course, the economic losses result from the intentionally caused emotional distress. (See Rest.2d Torts, § 46, *supra;* Prosser, Law of Torts, *supra,* p. 43.) A rule placing the emphasis where it belongs and permitting recovery of all proximately caused detriment in a single cause of action is more likely to engender public respect for and confidence in the judicial process than a rule which would require attorneys, litigants and judges to force square pegs into round holes.

We are not unmindful of the four to three decision after rehearing of our high court in *Reichert* v. *General Ins. Co.,* 68 Cal.2d 822 [69 Cal.Rptr. 321, 442 P.2d 377], but we are not persuaded that it bears substantially upon the problem in the case at bench. Neither do we believe that it detracts from the validity of *Crisci.* The problem confronting the court was whether the asserted right of action had passed to the trustee in bankruptcy, and the resolution turned on section 70 of the Bankruptcy Act. (68 Cal.2d at p. 829.) Although there is language in both the majority and dissenting opinions indicating that all of the justices believed the action sounded in contract on the pleadings there presented, it was not necessary for the court to determine whether the action sounded in tort or contract because, in either event, if the right of action was based upon an injury to a property interest, it was transferable to the trustee in bankruptcy. (68 Cal.2d at pp. 829 and 834; see also Civ. Code, § 954.) The problems confronting us were not touched upon in *Reichert,* and the *Crisci* decision was not mentioned by either the majority or the dissenters.

We are further persuaded of the applicability to the problem presented

---

[10]Apparently because of his proceeding on the emotional distress theory, plaintiff made no attempt to prove the value of the economic losses (e.g., the lost Arizona property and the late charges), and the record contains no evidence thereof.

by the case at bench of the principles set forth in *Crisci* by an analogy to the tort of intentional interference with contractual relations. If a third person, a legal stranger to plaintiff, were to interfere with plaintiff's rights under the insurance policy by conduct and with purposes similar to defendants' in the case at bench, that person would be liable to plaintiff in damages for all detriment proximately caused thereby, both economic loss and emotional distress and, in a proper case, could be assessed punitive damages. (See *Guillory* v. *Godfrey,* 134 Cal.App.2d 628 [286 P.2d 474]; *Campbell* v. *Veith, supra,* 121 Cal.App.2d 729; Rest., Torts, § 766 et seq.) There is no sound reason why plaintiff's legally recognized interests should receive less protection from interference by the insurer itself, which has a special duty to plaintiff of good faith and fair dealing, nor is there any reason why plaintiff's insurer should be held to a lower standard of conduct than a stranger.

In determining whether liability should be imposed for intentional infliction of emotional distress, "[t]he cases and commentators have emphasized the significance of the relationship between the parties in determining whether liability should be imposed. (See Prosser, Law of Torts [3d ed. 1964], ch. 2, § 11, p. 49; Harper and James, The Law of Torts [1956], § 9, pp. 666-667; Rest.2d Torts, § 46, com. e.; Magruder, *Mental and Emotional Disturbances in the Law of Torts,* 49 Harv. L.Rev. 1033, 1051-1063; Prosser, *Insult and Outrage,* 44 Cal.L.Rev. 40, 47; Annot., 15 A.L.R.2d 108, 158-163.)" (*Alcorn* v. *Anbro Engineering, Inc., supra,* 2 Cal.3d 493, 498, fn. 2.) Additionally, the special obligation of public utilities and other enterprises affected with the public interest has been noted as significant in the imposition of liability upon such defendants even in the absence of outrageous conduct, apparently upon a policy basis of encouraging fair treatment of the public whom the enterprises serve. (See Rest.2d Torts, *supra,* § 48; and Prosser on Torts (3d ed.) *supra,* pp. 44-47.)

Both of these considerations are pertinent to the case at bench. The insurance business is governmentally regulated to a substantial degree. It is affected with a public interest and offers services of a quasi-public nature. (*Barrera* v. *State Farm Mut. Auto. Ins. Co.,* 71 Cal.2d 659, 667-669 [79 Cal.Rptr. 106, 456 P.2d 674]; *California State Auto. etc. Bureau* v. *Downey,* 96 Cal.App.2d 876, 899 [216 P.2d 882]; *Stark* v. *Pioneer Cas. Co.,* 139 Cal.App. 577, 580 [34 P.2d 731].) ▆ An insurer has a special relationship to its insured and has special implied-in-law duties toward the insured. (*Barrera* v. *State Farm Mut. Auto. Ins. Co., supra; Crisci* v. *Security Ins. Co., supra,* 66 Cal.2d 425, 429.) To some extent this special relationship and these special duties take cognizance of the great disparity in the economic situations and bargaining abilities of the

insurer and the insured. (*Barrera* v. *State Farm Mut. Auto. Ins. Co., supra,* 71 Cal.2d 659.) To some extent the special relationship and duties of the insurer exist in recognition of the fact that the insured does not contract ". . . to obtain a commercial advantage but to protect [himself] against the risks of accidental losses, including the mental distress which might follow from the losses. Among the considerations in purchasing . . . insurance, as insurers are well aware, is the peace of mind and security it will provide in the event of an accidental loss . . . ." (*Crisci* v. *Security Ins. Co., supra,* 66 Cal.2d 425, 434.) These considerations are particularly cogent in disability insurance. The very risks insured against presuppose that if and when a claim is made, the insured will be disabled and in strait financial circumstances and, therefore, particularly vulnerable to oppressive tactics on the part of an economically powerful entity.

The motions for judgment notwithstanding the verdict were properly denied.

### Punitive Damages

The foregoing disposes of defendants' contention that punitive damages are improper because plaintiff's case sounds in contract. So, too, defendants' contention that section 10111 of the Insurance Code makes punitive damages impermissible cannot be sustained. (*Wetherbee* v. *United Ins. Co. of America, supra,* 265 Cal.App.2d 921, 927-929.) Defendants also urge that, inasmuch as the basis of the tort of intentional infliction of emotional distress is outrageous conduct, compensatory damages assuage the outrage and punitive damages should not be allowed in addition thereto. This contention is not meritorious. (*State Rubbish etc. Assn.* v. *Siliznoff, supra,* 38 Cal.2d 330; Civ. Code, § 3294.)

Although defendants' counsel in his opening statement to the jury admitted that defendant Western National had assets, there was no evidence introduced as to the financial condition of either defendant. Defendants contend that an award of punitive damages may not be upheld in the absence of such evidence. ▉ While the propriety and desirability of evidence of the defendant's financial condition where punitive damages are sought is indicated in *Coy* v. *Superior Court,* 58 Cal.2d 210, 223 [23 Cal.Rptr. 393, 373 P.2d 457, 9 A.L.R.3d 678], such evidence is not absolutely essential. (*Hanley* v. *Lund,* 218 Cal.App.2d 633, 645 [32 Cal.Rptr. 733].)

▉ Defendants next contend that Civil Code, section 3294 providing for the imposition of punitive damages is unconstitutional because of the vagueness of the words "guilty of oppression, fraud, or malice" as used in the statute. This contention cannot be sustained. An essentially similar contention was made and rejected in *Toole* v. *Richardson-Merrell Inc.,*

251 Cal.App.2d 689, 719 [60 Cal.Rptr. 398, 29 A.L.R.3d 988] (opinion on denial of petition for rehearing).

■ It is true that "[c]ivil as well as criminal statutes must be sufficiently clear as to give a fair warning of the conduct prohibited, and they must provide a standard or guide against which conduct can be uniformly judged by courts. . . ." (*Morrison* v. *State Board of Education,* 1 Cal.3d 214, 231 [82 Cal.Rptr. 175, 461 P.2d 175] and authorities there cited; *Orloff* v. *Los Angeles Turf Club,* 36 Cal.2d 734, 739 [227 P.2d 449].) However, " '[r]easonable certainty is all that is required. ■ A statute will not be held void for uncertainty if any reasonable and practical construction can be given its language.' [Citation.] ■ It will be upheld if its terms may be made reasonably certain by reference to other definable sources." (*American Civil Liberties Union* v. *Board of Education,* 59 Cal.2d 203, 218 [28 Cal.Rptr. 700, 379 P.2d 4]; *People* v. *Victor,* 62 Cal.2d 280, 300 [42 Cal.Rptr. 199, 398 P.2d 391].) ■ "[A] statute is sufficiently certain if it employs words of long usage or with a common law meaning, 'notwithstanding an element of degree in the definition as to which estimates might differ.' " (*Lorenson* v. *Superior Court,* 35 Cal.2d 49, 60 [216 P.2d 859] and authorities there cited.)

■ The word "oppression" has a well-established meaning. (See *Roth* v. *Shell Oil Co.,* 185 Cal.App.2d 676, 681-682 [8 Cal.Rptr. 514].) So does the word "malice." (See *Davis* v. *Hearst,* 160 Cal. 143, 158 [116 P. 530]; Pen. Code, § 7, subd. 4.) The word "fraud" may technically refer to a number of different legal problems. It is, however, a word of common usage and has a commonly accepted meaning: "an instance or an act of trickery or deceit especially when involving misrepresentation: . . . an intentional misrepresentation, concealment, or nondisclosure for the purpose of inducing another in reliance upon it to part with some valuable thing . . . or to surrender a legal right." (Webster's 3d Internat. Dict., Unabridged (1964); see also *Lesperance* v. *North American Aviation Inc.,* 217 Cal.App.2d 336, 345 [31 Cal.Rptr. 873].) The section is, therefore, not unconstitutionally vague. (*People* v. *Victor, supra,* 62 Cal.2d 280, 300; *American Civil Liberties Union* v. *Board of Education, supra,* 59 Cal.2d 203, 218; *Lorenson* v. *Superior Court, supra,* 35 Cal.2d 49, 60.)

### Error in Jury Instructions

Defendants attack the instructions given the jury on several grounds. They first urge that the court erred in refusing to give an instruction requested by defendants on actual cause.[11] ■ Obviously, an instruction

[11]The requested instruction read: "You are instructed that if you find that the statements or conduct of the defendant, Tom R. Amason, were intentional, and

on actual cause would have been appropriate. (*Spackman* v. *Good, supra,* 245 Cal.App.2d 518, 532-534 [54 Cal.Rptr. 78].) The instruction requested by defendants, however, was both objectionable in form and erroneous in substance. It would have limited the jury's consideration of defendants' conduct not only to the letters of August 25 and October 4, 1966 but also to "the statement of TOM R. AMASON." As discussed above, defendants' entire concerted course of conduct was the instrumentality of tort. Moreover, the jury was adequately informed by several other instructions that the emotional distress must have been caused by the conduct of defendants. An instruction was given defining proximate cause, and there is no reasonable likelihood that the jury was misled with respect to the problem of causation.

Defendants next complain about the instructions relating to compensatory damages. The court instructed the jury that if it should find that the plaintiff was entitled to a verdict, it should award plaintiff such amount as would compensate him reasonably for all detriment suffered by him and of which defendants' conduct was a proximate cause. The instruction continued: "In arriving at the amount of the award, you shall consider *any actual damage* which the plaintiff has *proved,* and *also* such sum as will compensate him reasonably for any fears, anxiety and other mental and emotional distress, if any, suffered by him and proximately resulting from the conduct in question." (Italics supplied.)

Defendants urge that the vices in this instruction are that it invited the jury to base its compensatory damage award not only on actual damage but also on some non-actual damage and not only on what the plaintiff has proved but also on its other findings, presumably not proved. Fairly read, we do not agree that such suggestions were made to the jury by this instruction. The wording of the instruction leaves much to be desired, inasmuch as, in an action for intentional infliction of emotional distress, the emotional distress *is,* except for economic loss resulting from the emotional distress, the plaintiff's *actual damage.* Nevertheless, under the evidence, we do not think it reasonably probable that the jury was misled or confused by the instruction.

In connection with the foregoing contention, defendants point

were unreasonable and outrageous, you must nevertheless bring in a verdict for both defendants if you also find that any emotional distress or disturbance of the plaintiff was not actually caused by the statement of TOM R. AMASON, but was in fact caused by other incidents, events, or circumstances. You must likewise bring in a verdict for both defendants if you find that any emotional distress occasioned to the plaintiff was caused by statements made by others than the defendants."

out an obvious error in the next succeeding instruction, which read in part: "The damages which the Court has just referred to are called compensatory damages and are designed to compensate the plaintiff *for any wrong* suffered by the plaintiff as the result of wrongful conduct by the defendants." (Italics supplied.) As defendants correctly state, compensatory damages are designed to compensate the plaintiff for *harm* resulting from wrongful conduct by the defendant. We fail to see, however, how the jury could have been misled or confused by the inadvertent use of the word "wrong" for the word "harm."

▮ Defendants also contend that several instructions relating to punitive damages were erroneous. One instruction included the statement: "Malice is defined as a wish to vex, annoy or injure another person, and may be proved by direct evidence of the evil motive and intent or by legitimate inferences to be drawn from the surrounding facts and circumstances." Defendants urge that there should have been added after the words "facts and circumstances" the words "in evidence," (see *Davis* v. *Hearst, supra,* 160 Cal. 143, 163), and that without the presence of this phrase, the jury was told that it could make a finding of malice on something other than the evidence. We agree that the instruction would be more complete with the addition of the suggested phrase, but we cannot agree with defendants' conclusion that, without it, the jury was invited to consider something other than the evidence. The jury was informed by the instructions as a whole, including BAJI numbers 1.00 and 1.02 (5th ed.), that their determination was to be made on the basis of the evidence.

▮ In another instruction the court informed the jury: "Oppression, as used in these instructions for the purpose of determining whether or not the plaintiff is *entitled* to punitive or exemplary damages is defined as . . . ." (Italics supplied.) Defendants urge that the jury was thereby informed that plaintiff was "entitled" to punitive damages contrary to the rule that a plaintiff is never "entitled" to punitive damages. (See *Brewer* v. *Second Baptist Church,* 32 Cal.2d 791, 800-801 [197 P.2d 713].) We do not agree that the jury was so informed. The jury was thoroughly instructed that it could award punitive damages only upon a finding of fraud, malice or oppression and after finding in favor of plaintiff as to compensatory damages. A review of the jury instructions requested by defendants discloses several using the very phraseology now complained of.

As indicated above, several of the instructions contained technical errors. ▮ A judgment will not be reversed for errors in jury instructions, however, unless, absent the error it is reasonably probable that the jury would have returned a verdict more favorable to the appellant. (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243]; *Wilkinson* v. *Southern*

*Pac. Co.*, 224 Cal.App.2d 478, 484 [36 Cal.Rptr. 689].) We have reviewed the entire cause, including the evidence, and it is our opinion that, absent the errors in the instructions, it is not reasonably probable that the jury would have returned a verdict more favorable to defendants.

### Excessive Damages

The jury's verdict was for $60,000 compensatory damages, $10,000 punitive damages against defendant Amason, and $640,000 punitive damages against defendant Western National. By conditionally granting Western National's motion for new trial, the trial judge reduced the award of punitive damages against it to $180,000. In so doing, the trial judge gave as one of his specified reasons, "There were strong emotional overtones at the trial that contributed to the making of an award for punitive damages that was in excess of the amount needed to punish the corporate defendant or to make an example of it." Defendants vigorously contend that the damage awards, even as modified, are excessive as a matter of law.

It would serve no useful purpose to set out in detail defendants' numerous arguments. Neither do we deem it necessary to reproduce here all of the well-known rules relating to appellate review of damage awards. They are fully set forth and discussed in *Finney* v. *Lockhart*, 35 Cal.2d 161, 164-165 [217 P.2d 19]; *Scott* v. *Times-Mirror Co.*, 181 Cal. 345, 364-367 [184 P. 672, 12 A.L.R. 1007]; *Seffert* v. *Los Angeles Transit Lines*, 56 Cal.2d 498, 504-509 [15 Cal.Rptr. 161, 364 P.2d 337].)

It is sufficient to note that the matter of the amount of damages, both compensatory and punitive, is a matter for the jury in the first instance and the trial judge thereafter. The presumptions are in favor of the correctness of the verdict and judgment. After an award has been approved by the trial court, an appellate court will not set aside the award as excessive unless a consideration of the entire record, including the evidence, is convincing that the award was the result of passion or prejudice. We are not so convinced in the case at bench.

By its conditional new trial order, the trial court indicated its belief that the original punitive damage award of $640,000 against Western National might have been the result of passion and prejudice, but it corrected the situation by reducing the amount of that award to $180,000. Defendants' conduct was outrageous. Their motive for engaging in such conduct was to save Western National approximately $50,000. Defendants' conduct was premeditated, continuous and persistent (cf. *Parrott* v. *Bank of America, supra,* 97 Cal.App.2d 14, 24), and defendant Amason, who was still employed as Western National's claims manager at the time of trial, indicated that he would conduct himself similarly if a similar

situation should again arise. ■ The primary function of punitive damages is to deter the defendant and those similarly situated from engaging in similar tortious conduct in the future. Under these circumstances we do not find the punitive damage award of $180,000 shocking nor suggestive of passion or prejudice.

■ As previously indicated, the jury could reasonably infer that plaintiff suffered severe emotional distress for many months. ■ As in the case of injury to reputation (*Scott* v. *Times-Mirror Co., supra,* 181 Cal. 345, 366) and pain and suffering (*Roedder* v. *Rowley,* 28 Cal.2d 820, 822-823 [172 P.2d 353]), there is no fixed or absolute standard by which to compute the monetary value of emotional distress, and the jury must necessarily be left to the exercise of a wide discretion, to be restricted by the appellate court only when the sum awarded is so large that the verdict shocks the moral sense and raises a presumption that it must have resulted from passion or prejudice. ■ "The question of what may be reasonable compensation in cases of this kind is a matter on which there legitimately may be a wide difference of opinion. . . ." (*Roedder* v. *Rowley, supra,* at p. 823.) ■ By leaving unchanged the $60,000 compensatory award in its conditional order for new trial, the trial court evidenced its belief that the jury's compensatory award was not the result of passion or prejudice, and, on the evidence in the case, we cannot say that it is excessive as a matter of law.

The judgment is affirmed.

Tamura, Acting P. J., and Kerrigan, J., concurred.

A petition for a rehearing was denied August 27, 1970, and appellants' petition for a hearing by the Supreme Court was denied October 1, 1970. McComb, J., was of the opinion that the petition should be granted.